## Charles Jackson v. The People.

The return to a common law writ of certiorari should set out the evidence upon which the conviction or other judical act complained of was founded.

The office of a certiorari is not, however, to review questions of fact, but questions of law. And, in examining into the evidence, the appellate court does so, not to determine whether the probabilities preponderate one way or the other, but simply to determine whether the evidence is such that it will justify the finding as a legitimate inference from the facts proved, whether that inference would or would not have been drawn by the appellate tribunal.

But the appellate court will review the rulings of law upon the admission or ex-

clusion of evidence, or other rulings in the proceedings having a bearing upon the result.

On certiorari to the Recorder's Court of Detroit, to remove the proceedings on conviction for a violation of a city ordinance, the evidence was embodied in the return by the clerk.—*Held*, to be properly before the court.

Until an alley in the City of Detroit has been actually open to the uses for which it was designed, the occupation or obstruction of it cannot properly be punished under city by-laws. In giving power to regulate the use of alleys, and remove obstructions from them, the charter contemplates the preservation of actual, and not theoretical easements, and the protection of the community against actual nuisances which interfere with the accustomed use of the passages.

And when, on complaint in the Recorder's Court of Detroit, for the obstruction of an alley, it appeared that the alley had never been opened or used as such; that the obstruction complained of existed at the time the ordinance was passed under which the proceeding was had, and that the main point in issue was that of title to the alleged easement, it was *held*, that the case was beyond the jurisdiction of the municipal tribunal, and that the rights of the parties must be settled in the public courts, where ample remedies exist for all parties aggrieved.

*Heard July 7th. Decided November 16th.*

Certiorari to the Recorder's Court of the city of Detroit, where Jackson was convicted on a complaint for obstructing an alley in said city.

In 7 *Mich.* 432, will be found the report of a trial of Jackson on an information for the obstruction of the same alley. After the decision in that case, the Common Council of said city passed an ordinance "to prohibit and punish the obstruction of streets and alleys." The first section of this ordinance provided "that no person shall obstruct any street or alley of said city, by placing or maintaining in the same any incumbrance, article or thing, which in any manner shall impede, interrupt or impair the use of said street or alley for the passage of teams or pedestrians." The second, provided that "no person shall build, place or maintain in any street or alley of said city, any fence, building, house, barn, railroad track, shed or construction of any nature." The third fixed the penalty on conviction in the Recorder's Court of a violation of this ordinance.

Under this ordinance the present proceedings were had against the plaintiff in error, and substantially the same evidence was produced to sustain the complaint as is reported

in 7 *Mich.* The testimony being concluded, the plaintiff in error requested the court to charge the jury:

"If the jury are satisfied from the evidence that the alleged obstructions complained of were in the *locus in quo* long before the passing of said ordinance, and that the defendant has done no act since that time to maintain or keep them there, he is guilty of no offense, and the jury must acquit him." The court refused so to charge, except with the addition and qualification, that if the jury find the *locus in quo* to be an alley, the failure to remove the obstruction after the ordinance was passed, was an offense for which the complaint in this case would lie.

The plaintiff in error further requested the court to charge the jury, that "simply allowing an obstruction of an alley to stand, without any affirmative act to maintain it, does not authorize a prosecution in the name of the People." The court refused so to charge, except with the addition and qualification that if the defendant put them there originally, he is liable for allowing them to remain.

The court also charged the jury, that if there was an alley in the place in question, the complainant had a right to have it freed from obstructions by a public prosecution under the ordinance, no matter whether one man only, or many, were incommoded by the obstruction.

In return to the certiorari, the Recorder's Court, by its clerk and under its seal, transmitted to this court "the whole of the evidence and proceedings in the said prosecution, mentioned and referred to in the writ" of certiorari.

*L. Bishop, and D. C. Holbrook* for plaintiff in error:

No public prosecution lies for obstructing the place in question, as it is only a *cul de sac*, and not a public way: — 7 *Mich.* 433. It can make no difference that the prosecution is under a city ordinance, as the violation of a city ordinance is a criminal offense: — 2 *Doug. Mich.* 334.

JACKSON *v.* THE PEOPLE.

The ordinance was *ex post facto,* and therefore void:—1 *Bish. Cr. L.* §§ 108, 346; 1 *Kent,* 450; 3 *Dall.* 386; 6 *Cranch,* 138; 1 *Blackf.* 193; 16 *B. Monr.* 15; 4 *Texas,* 470.

But it is said that on the common law writ of certiorari, only the question of jurisdiction will be considered; and that if the Recorder's Court had jurisdiction of the case, the determination of that court upon all points of law must be final. We are well aware of the general language in the New York cases on this subject. But in these cases the point passed off without discussion or careful consideration. In 25 *Wend.* 166, Senator Paige reviews the subject more fully. But *convictions for penalties* formed an exception to the old rule, and in such cases the whole evidence must be returned, that it may be seen whether the court below had *authority to convict,* as well as *jurisdiction to try.* The question being whether a party was *legally convicted,* the whole proceedings and the whole evidence must be set forth in the return:— 2 *Str.* 996; 1 *Yeates,* 471; 4 *Rawle,* 192; 20 *Wend.* 105. This has been the uniform practice of this State. The following cases have been decided upon the merits, upon a return of the whole evidence and proceedings:—1 *Doug. Mich.* 48; *Ibid.* 178; 2 *Doug. Mich.* 117; *Ibid.* 120; *Ibid.* 334; *Ibid.* 368; *Ibid.* 372; *Ibid.* 374; 1 *Mich.* 17; 2 *Mich.* 408; 3 *Mich.* 18; 7 *Mich.* 472.

*A. Russell,* for the People:

A common law certiorari brings up for review only the record, or written pleadings, orders or entries in the nature of a record, and not testimony or matter *in pais.* The writ does not command or authorize the making up and authentication of a record of what passed orally at the trial below, for the sole purpose of the return: *Bac. Abr. Tit. "Certiorari."* 1 *Doug. Mich.* 320; 3 *Caines,* 86; 6 *Cow.* 555, 556; 7 *Cow.* 108, 157; 17 *Wend.* 470; 19 *Wend.* 42; 25 *Wend.* 312; 20 *Wend.* 145; 20 *Wend.* 103; 25

*Wend.* 168 ; 2 *Hill,* 9 ; 2 *Hill,* 398 ; 35 *N. H.* 521 *and cases cited;* 4 *Jones Law,* 309 ; 13 *Ill.* 663 ; 14 *Ill.* 381 ; 18 *Ill.* 324 ; 3 *Wis,* 740 ; 5 *Wis.* 191 ; 1 *Tidd. Pr.* 398 ; 2 *Burr. Pr.* 193, 197.

In N. Y. for a series of years, the decisions are unbroken, and N. H., Ill., Wis. and N. C. courts hold the same doctrine, and follow the N. Y. and Eng. cases.

In *Morewood v. Hollister,* 2 *Selden,* 315, Pratt J., in his opinion in the S. C. affirms the doctrine, but the court held that the cases in 17, 19 and 20 *Wend.* were erroneous in deciding that the *certiorari given by the N. Y. L. & T. acts did* not enlarge the powers of the *common. law* writ.

*But this case' does not attack* the previous decision in respect to *that* writ: — 4 *Seld.* 569 ; 3 *Barb.* 401 ; 15 *Barb.* 186 ; 24 *Barb.* 521.

It follows then that this court *can not review* the *merits* upon this writ, but merely the question of jurisdiction ; because the *merits, i. e.* the testimony, or mass of facts from which the *the* fact, always disclosed by the record, as the *decision,* springs, can be made matter of record only by force of a statute.

And in N. H. by statute they now have a bill in all cases of special inquiry : — 35 *N. H.* 521.

There is no difference between *civil* and *criminal* cases in respect to the review upon certiorari. But if there was, in 7 *Mich.* the present case was held not to be a *criminal case.*

But there is one practical difficulty in this case. The *clerk* has certified the evidence. How can the clerk of a court of record certify what the evidence was at a trial? The judge, if anybody, must so certify ; for in no sense are the judge's minutes matter that the clerk can certify. They are not of *record* in the court below. A court, *as such,* by its clerk can not do this. The magistrate must do it as a person.

JACKSON v. THE PEOPLE.

The return shows jurisdiction of party and subject matter, and that the proceedings were regular. The charter invests the Council with power to pass the ordinance. The Recorder's Court is made the tribunal for the trial of breaches of ordinances. The defendant was served with process, put in a plea, demanded and received a jury. That there was *some* evidence, appears from the recital of the verdict in the judgment — 7 *Mich.* 486: and this court will certainly not *weigh* facts — *Ibid.*

The complaint alleged an offense over which, *if the offense charged was true in fact*, the Recorder's court had jurisdiction: *and the jurisdiction can not be made to depend upon the truth or falsity of the facts, or upon the evidence being sufficient or insufficient to establish the corpus delicti brought under investigation.* Otherwise the Recorder would be liable to an action for imprisoning Jackson: — 1 *Q. B.* 66; *Ibid.* 620; 1 *Man. & G.* 257; 1 *B. & B.* 137; 18 *Ark.* 380; 8 *Q. B.* 413.

The ordinance is not *ex post facto.* It does not make the placing of an obstruction before the ordinance criminal, but the continuing it afterwards. The doctrine here is the same as in nuisances; namely: that the mere continuance is a fresh nuisance: — 1 *Denio*, 257, *cases cited;* 2 *Kern.* 492; 16 *Pick.* 175.

CAMPBELL J.:

The first question which arises is, how far are we at liberty to look into the proceedings returned by the Recorder's Court, to ascertain whether the Recorder erred in any respect within our supervisory control.

It is claimed on behalf of the People that, upon a certiorari at common law, the only thing to be determined is whether the court below had jurisdiction; and that if jurisdiction existed, the discretionary power of the court can not be inquired into. And it is further claimed that the jurisdiction depends upon the subject matter of the

complaint. Applying this rule to the case before us, it is insisted that the Recorder's Court has jurisdiction of all complaints for obstructing alleys, and that this jurisdiction being called into exercise by such a complaint, its proceedings thenceforth are not examinable unless an unauthorized judgment is given beyond the one allowed by law. As the same immunity from review applies to all special tribunals not acting according to the course of the common law, it becomes very important to ascertain how far this doctrine is correct; for if true it certainly gives them an extent of authority over persons and property not possessed by any of the higher courts.

There are certain classes of questions which, by the common understanding from time immemorial, belong to the course of judicial inquiry under the laws of the land. The common law, and the various charters and bills of rights, recognized and assured the right to such an inquiry. And the Constitution of this State, in apportioning the judicial power, as well as in affirming the immunity of life liberty and property, has always been understood to guarantee to each citizen the right to have his title to property and other legal privileges determined by the general tribunals of the State. These municipal courts, so far as they act under city by-laws, are not designed to decide between man and man, or to administer general laws. They are ordained to prevent disorder in matters of local convenience, and to regulate the use of public and quasi public easements so as to prevent confusion. If in exercising this power, they can incidentally decide upon the rights of private property so as to determine its enjoyment without review, there would seem to be a practical annihilation of the right to resort to the general tribunals and the common law. The consequences of such a doctrine, whether correct or incorrect, are serious enough to render it our duty to examine very carefully into its foundations.

The power of reviewing upon certiorari judicial pro-

·ceedings of inferior tribunals and bodies not according to the course of the common law, has long been exercised in England, as well as in this country. The power has been jealously maintained, and has been deemed necessary to prevent oppression. It must be apparent to any one that if the superior court could only examine into the right of the inferior one to enter upon an inquiry, without reference to the manner in which that inquiry is conducted, this remedy would be of small account.

In New York, a series of decisions have appeared from time to time, asserting that when certiorari is given by statute, it lies to correct any legal mistakes; but where issued as at common law, it can only review the jurisdiction of the court below. It is unnecessary to refer particularly to these authorities, inasmuch as in *Morewood v. Hollister*, 2 *Seld.* 309, this distinction seems to be regarded as unfounded, and the office of the writ is considered as reaching all errors of law. We have examined with much care all the English authorities within reach, bearing upon this subject, and have found nothing whatever to give color to such a distinction. There are indeed cases where a *certiorari* lies to examine errors generally, and others where it lies only to inquire into the jurisdiction; but the distinction arises out of very different considerations. This will appear by reference to some of the cases in which questions of jurisdiction have been reviewed.

There are many statutes in England which, not only in large classes of summary convictions, but also in special proceedings for condemning lands, and for other purposes, take away, in express terms or by acknowledged implication, the right to a *certiorari*, which otherwise existed. In some cases an appeal lies to review the whole proceeding; in others, it is subject to no further examination on the merits. In all these cases it is held, that a statute taking away the right to a *certiorari* does not deprive the aggrieved party of the right to sue out such a writ where the pro-

ceeding has been without jurisdiction.   And the want of jurisdiction, when arising from matters not appearing in any way on the proceedings, may even be shown *aliunde* by the affidavits: — *Regina v. Manchester & Leeds Railway Co.*, 8 *Ad. & El.* 413; *Regina v. Sheffield Railway Co.*, 11 *Ad. & El.* 194; *Rex v. Justices of Somersetshire*, 5 *B. & C.* 816; *Rex v. Justices of Kent*, 10 *B. & C.* 477; *Rex v. Justices of Middlesex*, 5 *Ad. & El.* 626; *Ex parte Carruthers*, 2 *Man. & Ry.* 397; *Regina v. South Wales Railway Co.*, 13 *Q. B.* 988; *Ex parte Hopwood*, 15 *Q. B.* 121; *Ex parte Hyde*, 5 *Eng. L. & Eq.* 368; *Regina v. Justices of St. Albans*, 18 *Eng. L. & Eq.* 244; *Regina v. Justices of Staffordshire*, 30 *Eng. L. & Eq.* 402; *In Re Edmondson*, 24 *Eng. L. & Eq.* 169; *Regina v. Leeds & Bradford Railway Co.* 11 *Eng. L. & Eq.* 484.

If *certiorari* will lie for want of jurisdiction in cases where the common law remedy of *certiorari*, in its usual acceptation, is expressly or confessedly taken away, it follows as an unavoidable conclusion that the usual office of the common law writ is to inquire into something more than jurisdiction.   This may be made more plain by examining what is required to be returned.

It was held in *Rex v. Killett*, 4 *Burr.* 2063, that it is necessary to set out the evidence upon a conviction, that the court may judge whether the justices have done right. And in *Rex v. Read*, 2 *Doug.* 486, it was held that a conviction is bad unless it does set forth the evidence. The same doctrine is laid down in *Rex v. Clarke*, 8 *T. R.* 220; *Rex v. Smith*, 8 *T. R.* 588; *Regina v. Tuck*, 10 *Q. B.* 540.   And where the evidence set out is not sufficient to justify a conviction, or other judicial act complained of, it will be quashed on certiorari: — *Rex v. Smith*, 8 *T. R.* 588; *Rex v. Dove*, 3 *B. & Ald.* 596; *Rex v. Taylor*, 2 *Chit. R.* 578; *Rex v. Hall*, *Cowp.* 728; *Rex v. Daman*, 2 *B. & Ald.* 378; *Rex v. Davis*, 6 *T. R.* 177$_{3}^{3}$; *Rex v. In_ habitants of Great Wishford*, 4 *Ad. & El.* 216; *Rex v.*

*Inhabitants of Woolpit,* 4 *Ad. & El.* 205 ; *Regina v. Inhabitants of High Beckington,* 3 *Q. B.* 790.

The office of a certiorari is not however to review questions of fact, but questions of law. And in examining into the evidence the appellate court does so not to determine whether the probabilities preponderate one way or the other, but simply to determine whether the evidence is such that it will justify the finding as a legitimate inference from the facts proved, whether that inference would or would not have been drawn by the appellate tribunal. It is said in *The King v. Daman,* 2 *B. & Ald.* 378, that " all the facts necessary to subject the party to the penalty imposed by the act of Parliament must appear upon the information, and be established by proof." And in *The King v. Davis,* 6 *T. R.* 177, it is said "it is sufficient in convictions if there were such evidence before the magistrates *as in an action would be sufficient to be left to a jury."* The same principles are recognized in the other cases above cited. Also in *Rex v. Glossop,* 4 *B. & Ald.* 616 ; *Regina v. Bolton,* 1 *Q. B.* 67.

Where facts exist which, if apparent, would have ousted the jurisdiction, they have been allowed to be set forth in the affidavits of the relator, and a response required. Instances of this occur where the magistrate acting was disqualified by interest or other similar cause : — *Regina v. Bolton,* 1 *Q. B.* 67 ; *Regina v. Cheltenham Com'rs,* 1 *Q. B.* 467 ; *Regina v. Justices of Hertfordshire,* 6 *Q. B.* 753. And in *Regina v. Gillyard,* 12 *Q. B.* 527, a conviction was quashed, although perfectly regular, because it was made to appear that it was obtained *fraudulently.*

The same principles which require a conviction to be quashed when upon the facts and the law applicable to them the case is insufficient to justify it, would seem to require that rulings of law upon the admission or exclusion of evidence should be reviewed. And such we find to have been the practice. In the case of *Regina v. Chel-*

*tenham Com'rs,* 1 *Q. B.* 467, the rate complained of was quashed because certain interested magistrates voted upon the admission of evidence, the court holding this a decision which might have had an important influence upon the result, and therefore sufficient to avoid the whole action, whether the interested magistrates took any further part or not. And. in this case the statute had expressly taken away the writ of certiorari; and it was issued and the case decided, on the ground that the question from its bearing became one of jurisdiction. An in *Regina v. Justices of Hertfordshire,* 6 *Q. B.* 754, the proceedings were quashed because an interested magistrate had sat during a portion of them, although he withdrew before they were completed. The questions of law arising either upon the admission of evidence, or the other rulings in the proceedings, must always have a bearing on the result, and the appellate court can not, generally, at least, assume that any of them have not contributed to it. In *Regina v. Justices of Staffordshire,* 30 *Eng. L. & Eq.* 402, where certiorari was expressly taken away by statute, a writ was allowed, and a conviction under a local by-law quashed because the justices had ruled that an approval of the by-law by the Secretary of State made it binding, and therefore refused to consider its validity. The court of Q. B. held the by-law invalid, and so quashed the conviction.

We are therefore of opinion, that the return to the certiorari is all properly before us, and that the law contemplates that it shall be full, both upon the evidence and upon the decisions and rulings.

Whether the information is sufficiently full to be sustainable, we do not propose to consider, as in our view the proceedings in the Recorder's Court are entirely unauthorized. The charter not providing any remedy upon the obstruction of an alley, no offense exists, and therefore no complaint can be made, until a by-law is adopted, coming

within the powers given by the charter. In the case before us, it appears, without any conflict of testimony, that the alleged alley in controversy was never actually opened and used as such at all. It also appears that portions of it have been occupied under claim of freehold · title under conveyances, and that the erections upon it now complained of were upon it when the by-law in question was passed. Without basing our decision merely upon the *ex post facto* character of this by-law, we are of opinion that until an alley has become actually open to the uses for which it is designed, the occupation or obstruction of it can not properly be punished under city by-laws. In giving power to regulate the use of these passages, and remove obstructions from them, the charter contemplates the preservation of actual and not theoretical easements, and the protection of the community against actual nuisances which interfere with the accustomed use of the passages. This is the species of offense set forth in the information, which alleges the interruption of an accustomed passage. Until the premises have been brought into actual enjoyment, so that their obstruction interferes with an existing user, there would be no propriety in permitting the municipal authorities to legislate upon it; and we do not ·regard the charter as intending it. Questions of title may possibly come up incidentally without objection in many summary proceedings. We give no opinion upon this abstract question, But where it appears on the face of the prosecution that the question of title is not incidental, but is the main point in issue, we think the case falls beyond the jurisdiction of the municipal tribunal, and the rights of the parties must be settled in the public courts, where ample remedies exist for all parties aggrieved.

We think the conviction wrong, for these reasons, and it must be quashed.

CHRISTIANCY J. concurred.

MARTIN CH. J. concurred in the result.

MANNING J.:

I concur with the majority of the court, that on a common law certiorari, this court will not only inquire into the jurisdiction of the inferior tribunal, but also into errors of law occurring on the trial, and affecting the merits of the case; but I disagree with them on the merits.

By the act of Congress of April 21, 1806, for the adjustment of titles to land in the town of Detroit, and territory of Michigan, and for other purposes — 2 *U. S. Statutes at Large* 398, the Governor and Judges of the territory, or any three of them, were authorized to lay out a town, including the whole of the old town of Detroit. A town was laid out by them, in pursuance of the act, as appears by the evidence, and as was decided by this court in the case of the *People v. Carpenter*, 1 *Mich.* 273. And on the 27th April, 1807, having completed the plan or a part of it, the Governor and Judges

"*Resolved unanimously*, That the plan of the sections numbered 1, 2, 3, 4, 6, and 8 be confirmed, and be a record; that they be signed by the President of the Board, and attested by the Secretary in identification; and that no alteration be suffered therein, without an order of the Governor and Judges to that effect."

The *locus in quo* is in section eight, mentioned in the resolution. The section or square is divided into lots, and is bounded on each side by a street. From the street on the north there is an alley running south to the centre of the square, where it is met by another alley running west from the street on the east side of the square. Lot No 1 is on the south east corner of the square, and is bounded on the east by lot No. 54, and on the north by lot No. 2, and the *locus in quo* or alley, which commences on the north line of lot one, next to lot 54, and runs thence

north between the west line of lot 54 and the east line of lot 2, some fifty feet, when it deflects to the east, and opens into the aforesaid alleys at their junction in the centre of the square.

It is not necessary to decide whether the Governor and Judges, after the resolution of the 27th April, could make any alteration of section eight; for it is not pretended they ever did, unless it was done by certain conveyances subsequently made by them, which I shall presently have occasion to notice.

By laying out the town into lots, to be donated or sold by them in pursuance of the act, with streets, alleys and public squares or parks, the latter were dedicated to the public. This is not controverted, but, it is said, to render the dedication effectual, or to give the public an interest in the streets, alleys and parks, there must have been an acceptance of them by the public. This is conceded on the part of the prosecution; but it is not necessary the acceptance should have been accompanied by immediate acts of user; or in other words the use of the thing dedicated by the public is not the only evidence of an acceptance. The doctrine of acceptance, or of the necessity of an acceptance, to make the dedication complete, rests on the principle that an individual can not impose on the public, without its consent, the burden of keeping a way laid out by him in repair. It is worthy of consideration whether acceptance, when there is a clear dedication, is necessary for any other purpose than to show this liability.

But when the power dedicating has the power to accept, as is the case when the government lays out a road over its own land, the act of dedication is in itself complete, without the assent of any subordinate authority to give it effect.

The *locus in quo*, for aught that appears, belonged to the United States at the time the town was laid out by

its authority; and if it was necessary, to give full effect to the dedication, that it should have been accepted by the territorial authorities, that was done by the Governor and Judges, in their legislative capacity, on the eighteenth of May, of the same year, by an act entitled, "An Additional Act concerning the Town of Detroit." By this act it was provided, among other things, that in the avenues of the town, a space of ten feet should .be allowed, contiguous to the front of lots, for purposes specified in the act; and that ten feet contiguous ˙ to the last mentioned ten feet should be allowed for certain other purposes; and that in streets, not exceeding fifty feet in breadth, a space of seven feet should be allowed. And˙ by " An Additional Act concerning the City of Detroit," passed November 7, 1815, it was provided, that nothing should be˙ erected within the ten feet mentioned in the previous act, exceeding fifty iuches in height, excepting porches, &c., and the city which was incorporated as such on the 24th October preceding, was authorized to make additional regulations. (*Some of the Acts of the Territory of Michigan, with the titles, and a digest of all the Acts of said Territory. Printed by Theophilus Mettez, March* 20*th* 1816, *pp.* 40, 41.*) In the case of *The King v. Lyon,* 5 *Dow. & Ry.* 497, it was held that where a way had been recognized as public in an act of Parliament for making streets, squares, &c., it was not necessary it should be adopted by the parish to make it a public way.

If any thing further was needed to show an acceptance of the dedication, we have it in a resolution passed by the Common Council of the city of Detroit, on the 2d December, 1835, directing the city clerk to take the necessary steps to have the plan adopted by the Governor and Judges, and signed by them in 1807, recorded in the county and city registers' office. Here was a clear act of

---

*This is what is commonly called the " Cass Code."

acceptance by the city itself, and the streets, alleys and public squares, designated on the plan, so far as they were extended over land belonging to the United States, then, if not before, became vested in the city for the purposes mentioned. But so far as the plan extended over the lands of third persons, it was wholly inoperative, as was held by this court in *The People v. Jones*, 6 *Mich*. 176; for the government can not, any more than an individual, dedicate what does not belong to it.

It is said the deeds, of lot 54 to Ann Dyson, and of lot 3 to Mary Desnoyer, were an alteration or revocation by the Governor and Judges of that part of the plan making the *locus in quo* an alley. There are several answers to that objection.

1st. The deeds were not executed until March, 1839, and the dedication was accepted by the Governor and Judges, in their legislative capacity, as I have already shown, on the 18th May, 1807.

2d. If the dedication could have been modified by the Governor and Judges, after their resolution of the 27th April, 1807, it must have been in pursuance of a reservation of power for that purpose in the dedication itself, or as an incident to the power to lay out the town. The deeds to Mrs. Dyson and Mrs. Desnoyer were not the exercise of either of those powers, but of a power wholly different — a power to donate and sell lots in the town to be laid out by them. And,

3d. The descriptions in the deeds of the lots conveyed, so far as they are repugnant to the plan of the town, are wholly nugatory and inoperative. Each of the deeds is of a lot according to the plan of the town, stating the section, and the number of the lot; and in each case, in giving what purports to be a further description of the lot, one of the lines bounding the lot is made to exceed in length the same line on the plan, and to project half way across the alley, thereby including a triangular piece of

the alley as a part of the lot. When the whole of a description of premises, intended to be conveyed, can not stand together by reason of one part being repugnant to another, and a part may be rejected and still leave a sufficient description, the rule is, that that which is most material and certain shall control that which is less so : — *Jackson v. Camp*, 1 *Cow.* 605 ; *Doe v. Thompson*, 5 *Cow.* 371 ; *Jackson v. Moore*, 6 *Cow.* 706. If we reject the plan, and the numbers of the lots mentioned in the deeds, the latter would be no better than blank paper; for the premises intended to be conveyed could not be identified from the balance of the description. Whereas, by retaining these, and rejecting the number of square feet each lot is described as containing, and the length of the south line of lot 3, and of the north line of lot 54, full force and effect are given to the deeds.

Besides, the resolution of the Governor and Judges, of 15th December, 1808, for the conveyance of lot 3 to Mrs. Desnoyer, and lot 54 to Mrs. Dyson, describes the lots by their numbers and sections, on the plan, and in no other way.

The Recorder was requested to charge the jury, that if they were satisfied from the evidence that the *locus in quo* was not opened, marked, or used as an alley, prior to April 4th, 1827, when an act entitled "An Act relative to the city of Detroit" took effect, then the *locus in quo* could not be opened and used as an alley by the city authorities, or by private persons, except on notice to the adjoining owners, and the adjustment and payment of damages to them, as provided by sections 18 and 19 of said act, and other similar acts.

This request must have had its origin in a misconception by counsel of the purport and effect of the act referred to When an individual dedicates a road to the public, and it is accepted by the public, it immediately becomes a public

highway, without any further act on the part of the public. To open a street or highway, in the ordinary acceptation of those words, means to acquire a public right of way, by the assessment and payment of damages to the person whose land is to be taken for that purpose. In this sense, and no other, they are used in the act just mentioned. By the first section of the act, the city limits are made to extend three miles back from the Detroit river; and by the 13th, 14th, 15th, 16th and 17th sections, the Governor and Judges' plan is recognized, and the Common Council of the city are authorized to make certain alterations therein, by re-laying out certain parts of the city, included within the plan — after having made provision by an ordinance, to be passed by them and approved by the freemen of the city, for compensating such as should be injured by the alteration. The 18th and 19th sections have no reference whatever to the streets and alleys on the Governor and Judges' plan, but to streets to be thereafter laid out, within that part of the city limits not included in the Governor and Judges' plan, and to such other streets, within the latter, as might thereafter become necessary, and did not come within the purview of the previous sections. It would be a new feature in legislation, hitherto unknown, to require the public to pay for what had been given to it.

The court was also requested to charge that, if the obstruction was in the *locus in quo* before the passage of the ordinance, and defendant had done no act since to maintain or keep it there, the jury must acquit him. I think the Recorder was right in refusing so to charge, and in charging that a failure to remove the obstruction, after the ordinance was passed, was itself an offense. To determine the reasonableness of the request, and the correctness of the charge, the evidence must be looked into, and the decision made with reference to it. The evidence tended to show the obstruction complained of consisted in a fence, erected by defendant, enclosing the alley with a lot owned

by him for private occupancy, and that he continued to occupy the alley, claiming to own it, after as before the passage of the ordinance. Now occupancy, in such circumstances, without any other act, was a maintenance of the obstruction. It was not necessary defendant should have replaced a worn out or broken rail in the fence with a new one, after the passage of the ordinance, to bring him within its penal provisions. If the evidence presented a case of obstruction by earth, or other refuse matter, thrown in the highway by defendant to get rid of it, before the passage of the ordinance, there would have been something to have based the request upon, which there was not in the case before the court.

The plan of the Governor and Judges, and the record of their proceedings showing its adoption, and their subsequent conveyance of lots, were properly admitted as evidence. If it was necessary to give them validity they should have been reported to Congress, it will be presumed after the lapse of half a century.

Various other objections were taken on the trial, but I see no reason in any of them for reversing the judgment. The evidence shows a dedication and acceptance of the *locus in quo* as an alley, and the unlawful inclosure of it by defendant, and his possession and occupancy of it as private property since the ordinance was passed.

The defense was two-fold: *First*, That the *locus in quo* was not an alley, 1st. Because there was no dedication or acceptance of it, both of which are proved by the evidence. 2d. Because the plan of the town, so far as it respects the *locus in quo*, was changed by the Governor and Judges, before it was accepted by the deeds of March 7th, 1809, to Mrs. Dyson of lot 54, and Mrs. Desnoyer of lot 3. The deeds I have shown were executed after the acceptance of the dedication by the act of the 18th May, 1807. And further, that in law they convey

no part of the alley; and were not intended by the Governor and Judges to convey any part of it, as appears by their resolution of the 15th December, 1808, authorizing the conveyances to be made. 3d. Because the *locus in quo* was not opened, marked or used, before the act of April, 1827, entitled an "Act relative to the city of Detroit." It required no opening, for it became a public alley the moment the dedication was accepted, to be used by the public and the occupants of adjacent lots, when, and as, occasion should require. It needed no marking to vest the public with a right to it as an alley; for it was sufficiently designated on the plan of the town. The act had nothing to do with the plan of the Governor and Judges, as I have shown, except to provide for the laying out of new streets, and the re-laying out of a part of the town that had been laid out by the Governor and Judges.

*Second:* The second ground of defense was, that the public had lost its right of way, by reason of the adverse possession of the *locus in quo* by defendant, and those under whom he claimed, for more than twenty years. The Recorder charged as requested on this point, and the jury rendered a verdict for the People, as they clearly should have done on the evidence before them. There was no evidence showing an inclosure of the whole alley before 1854, when it was enclosed by Jackson, after his purchase of lot 2 of James Williams. The alley, as I have already stated, runs between lots 2 and 54. Lot 2 was deeded, by the Governor and Judges, to Thomas Palmer, in 1831, and was described in the conveyance according to the Governor and Judges' plan, without giving its metes and bounds. In 1832, Palmer deeded it to L'Etourneau, describing it as in the deed from the Governor and Judges to himself. In 1854, L'Etourneau deeded it to James Williams, describing it as fifty feet by *eighty, and bounded on the east by a public alley*, the alley in question; and Williams afterwards deeded it to defendant *by the same*

JACKSON v. THE PEOPLE.

*description.* L'Etourneau, in 1832, fenced in the whole of the alley, except two feet next to lot 54, *but he did not claim or assume to own it;* and in 1848, he put up a shop *resting on blocks,* on that part of the alley enclosed by him, *after obtaining permission from Champ, who owned lot 1, and promising Champ to remove it when he should want to use the alley* — Champ at that time passing over a part of lot 54, which was not fenced on the line of the alley, to get to the rear of his lot.

The ordinance is not *ex post facto,* as was contended on the argument. Its penal provisions are prospective and not retrospective; and defendant is obnoxious to them not for fencing up the alley, which was unlawful at the time, but for continuing it fenced up, and thereby excluding the public from it, since the ordinance was passed.

I think the judgment should be affirmed.

*Judgment reversed.*