## DAVID PAINE *vs.* EDMUND M. WOODS & another.

A mortgagor in possession of land may maintain a complaint under the mill act without joining the mortgagee.

It is within the discretion of the presiding judge to allow a plan, not proved to be accurate, to be shown to the jury as a general representation of the situation and area of land.

The fact that a complaint under the mill act describes the lands bounding the overflowed tract by the names of their owners at the time when the complainant acquired his title, instead of by the names of those who owned them when the complaint was filed, is immaterial, if the identity of the premises is proved.

In assessing damages for overflowing a tract of woodland, the testimony of an expert is competent, in connection with a plan used at the trial as a general representation of the situation and area of the tract, to the injury of the wood by the flowing within the lines thereon.

A deed of land bounded "on" a pond which was used to be raised to an artificial height in the winter, and allowed in summer to remain at its natural level, conveys to low water mark of the pond in its natural state; and it is immaterial that it was executed in the winter.

In assessing damages under the mill act, the jury are to consider benefits resulting to the land flowed, and to the complainant's adjoining lands, from the formation of ice on it in the ordinary use of the dam, which might be cut and sold as merchandise without appreciably diminishing the defendant's water-power; and also benefits resulting thereto by reason of the more convenient opportunity, afforded to the complainant by means of the flowing, and through the use of his land, to exercise his right in common with the public to take ice from a natural pond by which the overflowed land was bounded.

In assessing damages under the mill act, the liability of the mill owner is not affected by proof of a former right of a third person to overflow the land by means of a more ancient dam, long ago demolished, without evidence that the right still exists or is asserted.

COMPLAINT filed December 3, 1869, under the mill act, Gen. Sts. *c.* 149, for the overflowing of "a certain tract of land of the complainant, situate in the town of Needham and bounded and

described as follows, viz. : Beginning at the southeast corner, by the Boston and Worcester Railroad and by land of Enoch B. Winch ; thence running northerly by land of said Winch to Broad's Pond, so called ; thence easterly and northeasterly on said pond (crossing the stream) to land of heirs of Ephraim Stevens ; thence southerly on land of said Stevens heirs to the aforesaid railroad ; thence westerly on said railroad, crossing said stream, to the place of beginning ; containing thirteen acres, more or less." The respondents answered that the complainant had no estate or interest in the land.

At the trial in the superior court, before *Reed,* J., it appeared that on February 28, 1860, the complainant became owner of the land, by a deed from Samuel M. Colcord, and had ever since been in possession and occupancy thereof ; and that on June 25, 1862, he mortgaged it to the Natick Savings Bank to secure a loan of money, which had not yet been repaid. There was no evidence that the mortgagees, although they have a right to take possession of the land for breach of the condition of the mortgage, ever have taken possession thereof, or made any entry, or taken any measures to foreclose the mortgage ; and it was agreed that the respondents' dam was erected after the delivery of the mortgage. Upon this state of facts it was contended by the respondents that the complainant was not entitled to a judgment and warrant for a jury, and no other question was raised. The judge thereupon directed a verdict for the complainant, and reported the case for the determination of this court, before whom it was argued in 1870.

*G. C. Tobey,* for the respondents.

*B. Sanford,* for the complainant.

WELLS, J. This is a complaint for flowage under the mill act. The complainant is the mortgagor in possession of the land flowed. The mortgage was given before the erection of the dam of the respondents. The mortgagee has never entered or taken any steps towards foreclosure. The ground of defence is, that the complaint cannot be maintained by the mortgagor without joining the mortgagee. The respondents insist that, as the mortgagee will not be bound by the judgment, they will be exposed

to the risk of making double compensation for the same injury, **if** these proceedings are maintained.

This objection is not tenable. So far as the proceedings may result in a judgment, conclusive and final, they relate only to damages suffered prior to the time of rendering the verdict. Gen. Sts. *c.* 149, § 18. The mortgagee has no interest in those damages. As between him and the mortgagor in possession, they belong exclusively to the latter ; like any other annual products, or damages for injury thereto, or to the possession of the land merely. The complaint is therefore properly brought in the name of the mortgagor alone, as the party in possession and entitled to the damages sought to be recovered.

It is true that, by § 20, the jury are also to ascertain and determine by their verdict, what sum, to be paid annually, and what sum in gross, " would be a just and reasonable compensation for the damages that may be thereafter occasioned by the dam." And by § 21, the complainant may elect to take such sum in gross, instead of annual damages. But no judgment is thereupon entered for either sum. To recover subsequent annual damages a new action of contract is the only remedy. See § 25 ; *Leland* v. *Woodbury*, 4 Cush. 245. Such action may be maintained by any person entitled to demand and receive the annual compensation. That right is not determined by the former verdict, except as to amount, but by the ownership and occupancy at the time the compensation falls due. § 23. Whenever the mortgagee takes possession of the land, he becomes entitled to demand and receive the annual compensation from that time ; and the right of the mortgagor ceases, or is suspended until he redeems the land. The mortgagee is bound by the verdict, determining the amount of such compensation, only so long as he may choose to acquiesce therein. He may at any time make a new complaint to have the amount increased.

To some extent, the same considerations apply in case the complainant elects to take the sum awarded in gross for all subsequent damages. Whether a mortgagor may receive such sum in gross, and thereby discharge the mill owner from further liability, so as to conclude the mortgagee, was treated as an open

question, and left undecided, in *Ballard* v. *Ballardvale Co.* 5 Gray, 468. In our view, it is not necessary to decide it here; because we think the respondents cannot be made liable to pay the same gross damages twice, unless it be from their own neglect to ascertain the state of the title, and to take proper measures for their protection against such double claim. The demand for the gross damages can be enforced only by another action of contract, under § 25. *Abbott* v. *Upham*, 13 Met. 172. *Leland* v. *Woodbury*, 4 Cush. 245. If the original complainant is not entitled to these damages, as against the mortgagee; and the mortgagee does not waive and intends to demand them; we do not doubt that his claim may, by proper proceedings therefor, be made to intervene, either for the purpose of securing to the mortgagee his rights, or of protecting the respondents from a double liability. See *Gooding* v. *Shea*, 103 Mass. 360. But this question does not arise unless and until the complainant shall file his election to take the damages in gross. For all the purposes of these proceedings, the mortgagor in possession is a sufficient party, without joining the mortgagee.

The judgment of the superior court, directing a warrant for a sheriff's jury to issue, is therefore                    *Affirmed.*

At the trial by the sheriff's jury, the following rulings were made and certified to the superior court:

1. The complainant offered a plan made by Austin Bacon, a surveyor, and also called Bacon as a witness, to show the area and situation of the land. By Bacon's testimony, and that of the complainant, it appeared, among other things, that in making the survey depicted on the plan Bacon did not consult the deed by which the complainant acquired his land, but took his oral statements of what land was to be surveyed and made the survey on that basis; that he "found it impossible to make an accurate survey of the contour of the mill pond," and accordingly "took the average of the lines;" that he did not know what the natural boundary of the mill pond was, and "nobody does;" and that it was impossible to estimate accurately the amount of land between high water mark and low water mark as indicated on the

plan. The respondents objected to the admission of the plan for any purpose ; but the sheriff permitted it to be used " not as an accurate plan of the premises, but as a chalk, showing generally the situation and area of the premises of the complainant flowed ; " and the jury took it to their room with the other papers in the case.

2. It was admitted by the complainant that neither at the time of the filing of the complaint, nor ever since, had the land, in respect to which he sought to recover damages, been bounded as described therein, to wit, by " land of Enoch B. Winch," by " land of heirs of Ephraim Stevens," or by " the Boston and Worcester Railroad ; " and, against the objection of the respondents, he was permitted to testify that at the time when he acquired the land in question it was so bounded, and his own wife had since, and before the filing of the complaint, become owner of the land described as land of Winch, the Boston and Worcester Railroad had become property of the Boston and Albany Railroad Company, and that corporation had become owner of the land described as land of the Stevens heirs, although it also appeared, by his testimony, that he knew of these changes of ownership before the filing of his complaint ; and thereupon evidence in his behalf was admitted, against the respondents' objection, " respecting overflow and injury from the dam to a tract of land bounded by land of the complainant's wife, and by Broad's Pond, and by lands of the Boston and Albany Railroad Company, the respondents not denying that it was in fact the same land described in the complaint."

3. John Kimball, a farmer, who had lived fifty or sixty years in Natick and was experienced in the value of woodland in the vicinity of that town, was a witness for the complainant, and testified, referring to the plan drawn by the surveyor Bacon, " that he had no particular acquaintance with the premises represented thereby, and knew hardly anything about them except what he saw there alone at one time about a year previously, when he went for the purpose of estimating the damage by flowage to wood growing there." Against the objection of the respondents, the complainant was then permitted to put the following question

to this witness : " What did you estimate the amount of damage to wood on the complainant's land by the flowage from the dam ? " The respondents requested the sheriff to rule " that the question should be answered irrespectively of the plan, and without regard to the lines thereon depicted." But the sheriff refused so to rule, and permitted the witness to testify " as to any damage to wood which he saw on any of the territory between high water mark, as indicated by drift, and the low water mark, or margin of the pond, as it would be when not raised by artificial means, as claimed by lines shown on the said Bacon plan."

4. For the purposes of the trial, it was agreed that Broad's Pond, mentioned in the complaint as one boundary of the complainant's tract of land, was originally a natural pond, and had been, for sixty years and more before the date of the deed under which he claimed his title, and ever since, increased beyond its natural size by water flowed back by a permanent dam erected upon the stream forming its outlet ; that for more than sixty years before 1868 it had every year been the usage of the owners of the dam to open sluiceways therein during the month of April or by the first of May, and keep them open until about the first of October, so that, while they were open, no water was flowed by the dam back upon said natural pond ; that the dam described in the complaint was an ancient dam, and in 1868 was raised by the respondents from twelve to twenty-five inches in height, and has been kept at this full height ever since, and no sluiceways have since been opened during the summer ; that the respondents acquired title to the dam and the mill in 1868 ; and that the complainant acquired title to the land, for the overflowing of which he sought damages, by deed from Manson Morse in October 1853, afterwards conveyed the same to Samuel M. Colcord, and again acquired title thereto on February 28, 1860, by deed from Colcord, which deeds were introduced in evidence and described the granted premises as bounded " to " and " on " said pond.

The respondents contended that they were not liable for any damages to land claimed by the complainant, under said deeds, lying below the line of the pond as it was during that portion of the year when the ancient dam (before the change of its height in

1868) was kept at its full efficient height; and the complainant contended that they were liable for all damages by flowing occasioned by their dam to his land down to the line of the natural pond, meaning thereby the line of the pond as it was before 1868, during the months when the ancient dam was open so that no water was thereby flowed back upon the natural pond.

The respondents offered evidence tending to show the high water line of the pond at the efficient height of the ancient dam, as usually operated at the time when the complainant acquired his title, (which high water line was in fact the highest line of the flowing occasioned by the dam during the winter and winters prior to 1868;) and argued that the complainant, under his said deeds, acquired no title to any land below said high water line, and could recover no damages for injury to land below said line by flowing since 1868 from their dam, and that no testimony should be admitted as to damage or injury below said line; and requested the sheriff so to rule. The sheriff excluded the evidence, and declined so to rule; and ruled " that they were liable for damages occasioned by their dam, as erected in 1868, to all land of the complainant described in his petition, and that by his said deeds he took title to all lands on the pond, included within the other boundaries named in his deeds, down to the low water mark, or the line of the water of the pond during the summer, when not raised by the ancient dam."

5. The respondents offered to show that seven acres of the land alleged to be overflowed were flowed to a sufficient depth to produce, and to enable the complainant to cut therefrom, ice of sufficient thickness, purity and other qualities to be vendible merchandise, which he could house upon his adjoining upland, or transfer across his adjoining land, and ship on the railroad to a market; and that the benefit derived, and capable of being derived, from this opportunity to cut and ship ice, was very great, and of pecuniary value; and they contended that it was a benefit which the jury should allow by way of set-off against any damages to the complainant's land by the alleged flowing. But the sheriff ruled " that the benefit, if proved, was one not proper for the consideration of the jury, and ought not to be estimated by them by

way of set-off to damages," and excluded the evidence. The respondents also offered to show that the flowed land, and also adjoining upland of the complainant, were enhanced in value by the creation of the pond from which the ice could so be cut ; and that this enhanced value should be allowed as aforesaid by the jury against the damages caused by the flowing. But the sheriff excluded this evidence also, and for the same reason. They then offered to show "that by using the water flowed by said dam upon said seven acres the complainant had been, and still was, enabled during the winter to float, and did float, large quantities of merchantable ice from the natural pond over and across the flowed acres, which except for said flowing he could not have done, to the upland of his land, whence the ice had been, and still could be, shipped directly on railroad cars to the market, and that such use and opportunity upon said flowed acres had been and then was of pecuniary value, respecting which they claimed a betterment to the flowed acres and to the adjoining upland, and a benefit and advantage to the complainant that should be allowed by way of set-off against damages caused by the flowing." But the sheriff ruled " that it was not admissible for them to prove any of the aforesaid benefits and betterments and facts offered by them to be proven."

6. The respondents offered further to prove " that the complainant had himself declared that without doubt the increased flowing from the dam had benefited said flowed acres more by far than it had injured them." But they admitted " that the declaration was made in conversations respecting the ice facilities, and that the benefits referred to by him were probably those above mentioned, or some of them ; " and thereupon the sheriff ruled that the evidence thus offered was not admissible.

7. The respondents offered evidence tending to prove the location of a still more ancient dam, long since demolished, but formerly crossing the same outlet of the pond at a point between the site of their dam and the complainant's land. They also offered in evidence " a deed from one Broad to Daniel Morse, conveying in 1813 said more ancient dam, and the land now of the complainant ; and a deed from said Daniel Morse, (under whom

the complainant now claims title to said land,) conveying in 1847 to Henry Wood (said Daniel Morse then owning the land described in the complaint) the dam complained of and the privileges and appurtenances thereto belonging, and especially ' the privilege to erect a dam nearer the central turnpike, where the old one used to be, for the purpose of making repairs at or near the mills, or for any other necessary purpose, as also the privilege of flooding my land to high water mark, or as high as I have ever flooded said land myself.' " They further offered evidence " showing the high water mark and the height to which said Morse (while he was the owner of the tract of land described in the complaint) commonly flowed the same by said more ancient dam prior to the delivery of his deed to Wood." They stated that they offered this evidence not for the purpose of proving any claim of right in themselves to flow the complainant's land, but as tending to prove that it was subject to an easement and servitude when he acquired his title thereto, and as affecting its value ; but the sheriff ruled that all of it was inadmissible.

The respondents excepted to the rulings of the sheriff ; and the jury returned a verdict for the complainant, which was accepted by the superior court, and the respondents appealed.

*G. C. Tobey,* for the respondents.

*C. I. Reed,* for the complainant.

GRAY, J. 1. The submission to the jury of the plan, accompanied by the testimony of the surveyor who made it and of the complainant, " not as an accurate plan of the premises," but as " showing generally the situation and area of the premises flowed," was within the discretion of the presiding officer. *Hollenbeck* v. *Rowley,* 8 Allen, 473. *Clapp* v. *Norton,* 106 Mass. 33. *Commonwealth* v. *Holliston,* 107 Mass. 232.

2. The fact that the lands by which the premises flowed were bounded were described in the complaint by the names of their owners at the time when the complainant acquired his title, instead of the names of their present owners, was wholly immaterial, so long as the identity of the premises was proved.

3. Kimball's testimony was rightly admitted. It concerned the damage done by the flowing to the land claimed by the com-

plainant. The objections made to it affected its weight, but not its competency.

4. The next two rulings of the sheriff present interesting questions as to the rights of proprietors of lands on the borders of great natural ponds.

The English books afford little light upon this subject. Sir Francis Moore, who drew up the Statute of Charitable Uses of 43 Eliz. *c.* 4, says, in his reading thereon, that " common ponds or watering places are within the equity of " the words " ports and havens " in that statute. Duke (ed. 1676) 5, 135 ; (ed. 1805) 8, 129. But the question whether the title in the land under a great fresh water pond or lake is in the proprietors of the lands adjoining, or in the crown, does not seem to have been ever judicially determined in England. *Marshall* v. *Ulleswater Steam Navigation Co.* 3 B. & S. 732. Hunt on Boundaries and Fences, (2d ed.) 19.

But the law of Massachusetts, from a period reaching back almost to the first settlement of the colony, has treated great ponds as of a character nearly resembling tide waters, the enjoyment of which for fishing and fowling and other uses was common to all, and the title in which and the lands under them was not the subject of private property, unless by special grant from the legislature. Body of Liberties of 1641, art. 16. Ordinance of 1647. Anc. Chart. 148, 149. *West Roxbury* v. *Stoddard*, 7 Allen, 158. *Commonwealth* v. *Vincent*, *post*, 441.

The general rule of construction of all grants of land bounded by water of any kind is now well established, that, unless qualified by restrictive words, they pass the soil towards the centre of the water, as far as the grantor owns. For example, where, as in this Commonwealth, the shore of the sea between high and low water mark is private property, it is included in a grant of land bounded " by the sea," or " harbor," or " bay," or other word descriptive of tide water. *Boston* v. *Richardson*, 105 Mass. 351, 355, and cases cited. So a grant of land, bounded by a river or stream above the ebb and flow of the tide, carries the grantor's title to the thread of the stream. *Boston* v. *Richardson*, 13 Allen, 146, 154, and 105 Mass. 351, 355, and cases cited. And this,

even if at the time of the grant the water of the stream has been permanently raised by artificial means so as to create a pond, and the grant is bounded generally by that pond. *Phinney* v. *Watts*, 9 Gray, 269, and cases cited. *Hathorn* v. *Stinson*, 1 Fairf. 224, 238, and 3 Fairf. 183. In like manner, a grant bounded by a great pond or lake which is public property extends to low water mark. Walworth, C., in *Canal Commissioners* v. *People*, 5 Wend. 423, 447. Shaw, C. J., in *Waterman* v. *Johnson*, 13 Pick. 261, 265. Hoar, J., in *West Roxbury* v. *Stoddard*, 7 Allen, 158, 167. *Wood* v. *Kelley*, 30 Maine, 47, 55. *Fletcher* v. *Phelps*, 28 Verm. 257.

The cases cited for the respondents, when carefully examined, will not justify taking the case at bar out of the application of the rules just stated.

*Waterman* v. *Johnson*, 13 Pick. 261, was the case of a complaint under the mill act for flowing land described in the deed under which the complainant claimed title as bounded by " Jones River Pond," a large natural pond, which before the date of the deed had at times been raised to a certain line by means of a dam of permanent materials, adapted in its ordinary use to raise the water to that line. The judge at the trial ruled that high water mark of the pond as thus extended would *primâ facie* be considered as the boundary of the complainant's land ; but admitted parol evidence to show, and the jury found, that at the time of the conveyance a certain natural bank or barrier, which was not thus overflowed, and which the natural pond had never overflowed, was intended and agreed upon by the parties as the marginal line of the pond referred to in the deed. The full court, in the judgment delivered by Chief Justice Shaw, after stating the general rules of law, that, when the description of a boundary in a deed had a definite legal meaning, parol evidence was inadmissible to control it ; that, by legal operation, a boundary by the sea or salt water gave a title in the soil to low water mark ; a boundary upon a river not navigable, to the thread of the stream ; upon a large natural pond, having a definite low water line, to that line ; and upon an artificial pond raised by a dam swelling a stream over its banks, to the thread of the stream, unless the

pond had been so long kept up as to have become permanent and to have acquired another well defined boundary; expressed an opinion that under the peculiar circumstances of the case the parol evidence was rightly admitted; and held that there was no ground in point of law, or upon the evidence in the case, upon which the respondents could claim that the grant did not extend, in the direction of the pond, as far as the barrier.

Upon that case, it is to be observed, 1st. The ruling at the trial, that the boundary was *primâ facie* to be considered as the high water mark of the pond as artificially raised, was inconsistent with the opinion of the full court; 2d. The only point necessarily involved in the decision was that the grant was not extended too far by carrying its effect to the natural barrier; 3d. That decision was equally sustained, whether the parol evidence was admitted, or the terms of the grant by their own force extended so far; 4th. The admission of the parol evidence was based upon the theory that the boundary on the pond, as applied to the subject matter, was governed by no settled rule of legal construction, but created a latent ambiguity; and the rules for the construction of similar grants were not then as fully established in this Commonwealth as they have since been by the later decisions already referred to. For instance, in *Tyler* v. *Hammond*, 11 Pick. 193, in the previous year, the court had held that a boundary by a highway generally extended only to the margin of the way — a doctrine wholly repudiated by the modern decisions. *Newhall* v. *Ireson*, 8 Cush. 595. *Phillips* v *Bowers*, 7 Gray, 21. *Boston* v. *Richardson*, 13 Allen, 146. *Stark* v. *Coffin*, 105 Mass. 328.

The other cases in this court, cited for the respondents, were not of grants of land bounded by a pond, but of the extent of the right of flowing obtained by grant or prescription. *Morse* v. *Marshall*, 11 Allen, 229, and 13 Allen, 288. *Cowell* v. *Thayer*, 5 Met. 253. *Ray* v. *Fletcher*, 12 Cush. 200. *Jackson* v. *Harrington*, 2 Allen, 242.

In *Bradley* v. *Rice*, 13 Maine, 198, the supreme court of Maine indeed held that where a natural pond had been raised by artificial flowing so as to become a mill-pond, permanently extended

beyond its natural limits, a grant of land bounded by the pond should be limited to the artificial margin of the pond in its present condition. But the same court, after fully considering that decision, has since held, that in such a case, when the margin varied at different seasons of the year, a grant bounded by the pond included all the land that was uncovered when the water was at the lowest. *Wood* v. *Kelley,* 30 Maine, 47.

In the present case, it appeared that the land in question was flowed, and the pond raised to an artificial height, in winter only, and that in summer the pond was allowed to remain at its natural level. Applying to this case the rules already stated, the conclusion is that the deeds, under which the complainant claims title, bounding him " to " and " on the pond," extended to low water mark of the pond in its natural state ; and that the fact that the deeds were made during the season when the pond was temporarily raised by the dam cannot affect the extent of their operation. The fourth ruling of the sheriff was therefore correct. The burden was of course on the complainant to prove that the premises for the flowing of which he claimed damages were above low water mark, and it does not appear that the jury were instructed otherwise.

5. The fifth question presented is, whether benefit to the land flowed and to adjoining lands of the complainant, by flowing part of his land to a sufficient depth to produce and to enable him to cut thereon ice suitable for sale as merchandise, was to be taken into consideration by the jury by way of diminishing the damages which the complainant had suffered by the flowing of his land by the respondents' dam.

Upon a complaint under the mill act, damages are to be assessed by taking into consideration any direct injury occasioned to the land by flowing it with water, and deducting any immediate benefits thereby caused to the same land or to adjoining lands of the complainant. Gen. Sts. *c.* 149, § 16. *Avery* v. *Van Deusen,* 5 Pick. 182. *Monson & Brimfield Manufacturing Co.* v. *Fuller,* 15 Pick. 554. *Palmer Co.* v. *Ferrill,* 17 Pick. 58. *Fuller* v. *Chicopee Manufacturing Co.* 16 Gray, 46.

The right of cutting and taking ice, either for use or for sale, from a great pond which is one of the public waters of the Commonwealth, is a public right, which may be exercised by any citizen who can obtain access to the pond without trespassing upon the lands of other persons, and who does not, by his exercise of the right, unreasonably interfere with its similar exercise by others. *West Roxbury* v. *Stoddard*, 7 Allen, 158.

But the ice formed in water over the land of a private proprietor, and not within the natural limits of a great pond, may, like the water in which it is formed, be taken and carried away by him, unless others have acquired paramount rights in it by agreement with him or by authority of law.

The owner of a mill-dam does not, by proceedings under the mill act, acquire any title in the land flowed, or in the water itself, but a mere right to raise the water by his dam. The owner of the land thereby flowed must not indeed draw off by canals, aqueducts or ditches, the water which has been raised by the dam. *Cook* v. *Hull*, 3 Pick. 269. *Storm* v. *Manchaug Co.* 13 Allen, 10. But he may use it for watering his cattle, or irrigating his crops and gardens, or any other reasonable purpose which does not practically and in a perceptible and substantial degree impair the right to run the mill ; and so he may take and carry away the water when formed into ice, for use or sale, provided he does not thereby appreciably diminish the head of water at the dam of the mill-owner. *Cummings* v. *Barrett*, 10 Cush. 186. And his land may be of peculiar value by reason of its situation affording opportunities to do this. *Ham* v. *Salem*, 100 Mass. 350.

It follows that if the land belonging to the complainant, and flowed by the mill-dam of the respondents in its contemplated and ordinary use, was benefited and increased in market value, either by reason of the ice which by such flowing was formed thereon, and which might be cut and carried away without appreciably diminishing the respondents' water power, or by reason of the more convenient opportunity thereby afforded to the complainant, by the use of his own land, to exercise the right, which he enjoyed in common with the whole public, of taking ice from

the natural pond by which his land so flowed was bounded, such benefit was to be taken into consideration by the jury in estimat ing the damages which he was entitled to recover for the flowing.

The argument of the complainant, that any such benefit is va-riable, and dependent upon the will of the mill-owner, inasmuch as he may at any time open his dam and let down the pond, would be equally applicable to any injuries for which damages were claimed, or any benefits relied on by way of set-off; for they are all estimated upon the theory that the dam will be kept up to the height contemplated and intended at the time of its erection.

The evidence offered by the respondents under the fifth point should therefore have been admitted.

6. For the reasons already stated, the declarations of the com-plainant upon the same subject were also wrongly excluded.

7. The evidence offered by the respondents to prove a right in a third person to flow the premises by means of a more ancient dam was wholly immaterial. The right supposed is not shown to have still existed or be asserted, and cannot affect the liability of the respondents to the complainant.

But the rejection of the evidence offered under the fifth and sixth points requires the               *Verdict to be set aside.*