JESSE DYER *vs.* NORRIS G. CURTIS and another.

Cumberland.    Opinion April 7, 1881.

*Ice pond.    Tide waters.    Dam.    Nuisance.    Prescription.    Lease, void from*
*public policy.*

A dam built across an arm of the sea, into which a fresh water creek empties, to exclude the salt water for the purpose of creating a fresh water pond, upon which to cultivate and harvest ice for the market, without direct authority of the legislature or the delegated action of harbor commissioners, if the case falls within their jurisdiction, is in the same sense a public nuisance as it would be to build a solid wall across a road or street.

Without such authority such a dam never acquires the right to exist by prescription.

Where, by the terms of a lease, the lessor agreed to keep up such a dam during a certain portion of the year, in consideration of the covenants of the lease, it was held to be an illegal contract.

No rule precludes either party from showing the illegality of a lease void from public policy.

A deed of a tide-mill privilege, mill dam, wharf privilege and the right to flow the creek and adjoining lands to high water mark, "and all the rights and highways connected with and belonging to said mill privilege," gives the grantee no right to ice cutting, nor title to the ice formed upon a fresh water pond raised by changing the dam so as to exclude the salt water.

ON REPORT.

The case is stated in the opinion.

The law court was to render such judgment as law and justice require.

*Webb and Haskell,* for the plaintiff.

These defendants do not claim any right to prevent the plaintiff from utilizing his mill property as an ice field in the winter season, why then should they be upheld in willfully appropriating to their own use the product of the plaintiff's property?  The use of the mill is lost to the plaintiff in order that he may harvest ice from his mill pond.

The controversy here is not whether the plaintiff has unlawfully shut out tide water, but whether, having done so and made an ice pond, the defendants who neither do nor can lawfully object,.

are justified in trespassing upon his possession and carrying away his ice.

If the defendants were not lessees when the ice sued for was taken they were strangers to the title and had no right to enter upon the premises.

*Strout and Holmes*, and *E. P. Payson*, for the defendants.

SYMONDS, J. The declaration contains one count for trespass upon real, and another for trespass upon personal estate. The close is described as a mill pond in Cape Elizabeth, the property removed as about six thousand tons of ice.

There is no dispute that the *locus* is a creek, or arm of the sea, within the ordinary ebb and flow of the tide; a small brook running in at the head of it. For a long period, perhaps sixty years or more, there has been a dam below, at the outlet of the creek into the broader parts of the bay or harbor. For the same length of time, except when temporarily destroyed by fire, there has been a tide mill at the dam, operated by letting the tide flow in through gates and fill the pond, holding it there till the tide had ebbed for about three hours so that the process of grinding could begin, and then grinding for about six hours, till the return of the tide stopped the wheel and began to fill the pond again. Upon the ebb of the tide, the mill would again be started by the full pond.

The extent of plaintiff's claim of title, under his deed from Charles Oxnard, July 1, 1874, is to this mill with its dam, ways, rights of wharfage and flowage, and what other rights pertain to it as a mill and mill privilege. He shows no other title by grant or by prescription in himself. If any former owners of the mill had acquired by deed or by possession a higher right than this; either a different easement in the premises or a fee in the flats flowed; the deed to the plaintiff did not undertake to convey it to him. The limit of his title under his deed is to the mill with its rights and privileges. The question of his possession does not at present arise.

Till the winter of 1874–5, no attempt had been made to cut ice for the market upon the mill pond, and the tide had flowed

in and out in the winter, as at other seasons. During that winter the sea was excluded by a solid earth work at the dam, the pond gradually filled by fresh water from the brook, on which ice formed, which was marketed by the firm of Curtis and Dyer, consisting of the plaintiff and one of the defendants. Whether the business of this firm continued during the winter of 1875–6, perhaps does not positively appear.

The right of the firm of Curtis and Dyer to use the mill pond in this way, and to cut and harvest the ice upon it, was evidently questioned by William W. Thomas and others, who claimed to be, or as trustees to represent, the owners of adjacent uplands, and asserted title to the flats, subject to the easement of the mill; and after some negotiation, on November 1, 1876, the defendants took a lease for four years, from those trustees, of certain lots which are said to include the place in dispute, and also of "the right to shut out the sea by a dam, and to flow with fresh water up to high water mark all the flats, marsh and thatch bed in Mill Creek. . . . . to cut ice thereon and remove it therefrom."

After this lease from the trustees had been obtained, on December 16, 1876, the defendants procured, also, a lease from the plaintiff for four years from November 1, 1876, with the right of renewal, and containing the following description of the premises demised : "the privilege to cut and harvest the ice on my mill pond. . . being the same pond and property held by me under deed from Charles Oxnard. . . . . giving said lessees full control of said pond and its flowage during the whole ice forming, cutting and harvesting season, viz. from the first day of November in each year to the twentieth day of March of the year following, if they so long need or desire to so occupy and use it; and *the said Dyer agrees to keep the dam of said pond at same height and in safe condition,* as same has hereby [heretofore?] been kept by him and by Dyer and Curtis, to his and their use and occupation of said pond in the ice business." The lessor might enter and expel the lessees, it was provided, if they failed to pay the rent or to keep their covenants.

In December, 1879, the plaintiff, claiming that the defendants had broken the covenants of his lease to them, entered upon the

pond to take possession, notified the defendants that such entry was for breach of condition, that their right of occupancy under the lease was ended, and any further entry or interference by them forbidden. The defendants, however, in fact retained the possession of a part of the pond that winter against the plaintiff's will, and between the last day of December and the date of the writ, cut and carried away the ice for which recovery is sought in this action.

Was this a trespass upon the lands or goods of the plaintiff? We think not.

It is settled law, that under the Massachusetts Colonial Ordinance of 1647, (*Comm.* v. *Alger*, 7 Cush. 53,) part of the common law of this State, the owner of the upland has the fee in the flats to ordinary low water mark, "where the sea doth not ebb above a hundred rods;" "until severed by some deed or act of the owner, competent to convey or transfer real estate"; but between low and high water mark he holds subject to certain reserved rights of the public. Navigation must not be obstructed, nor the passage of fish into bays, creeks, or up the course of navigable rivers, without legislative authority. These are matters of common right, and such an obstruction of them, even by the holder of the fee in the sea shore, is a public nuisance. They are rights, also, against which no prescription runs. No erection, injurious to them and without legislative sanction, ever acquires the right to be, by lapse of time.

The ordinance of 1647 "vested the property of the flats in the owner of the upland in fee, in the nature of a grant; but it was to be held subject to a general right of the public for navigation until built upon or inclosed, and subject also to the reservation that it should not be built upon or inclosed in such manner as to impede the public right of way over it for boats and vessels. We are not aware that this has been drawn in question by any judicial decision; but on the contrary we think that this construction has been uniformly recognized, adopted and applied, as occasion has required." *Comm* v. *Alger, supra; Low* v. *Knowlton*, 26 Maine, 128; *Moulton* v. *Libbey*, 37 Maine, 472; *Stoughton* v. *Baker*, 4 Mass. 522.

In the present case, no authority from the legislature is claimed. Suppose the plaintiff to hold all the title to the property purported to be conveyed to him by his deed, which it is possible for a citizen to have in such estate without legislative act; or assume for the present purpose that his deed gave him the fee in the flats of the creek, within the ebb and flow of the tide; the entire *jus privatum*. The creek is still a public highway, and the obstruction of it, so as to exclude the sea, a public nuisance.

It does not necessarily follow that the ancient mill and dam exist without right, and that the plaintiff has taken nothing by his deed. Fishways may be constructed and provision made for the passage of boats, by locks or otherwise, so that the private estate may be enjoyed to the full extent practicable, consistently with the public right. But to close this creek against the incoming tide, so as to make it a pool of fresh water for the formation of ice for the market, without either the direct authority of the legislature, or the delegated action of the harbor commissioners, if the case falls within their jurisdiction, was in the same sense a public nuisance as it would be to build a solid wall across a road or street.

It will be seen that the main consideration for the covenants of the defendants, contained in the lease from the plaintiff, was an agreement on the part of the latter to keep up during the term, from the first of November in each year, till the twentieth of the following March, this permanent obstruction of a public right. If this was not done, there was no ice to be cut. It is common knowledge that salt water creeks upon our shores are not naturally impassable by reason of ice during all that period.

It follows that the lease was an illegal contract and void. It is true that a tenant cannot ordinarily deny the title of his landlord, which he admits in the lease, or under which he receives possession. But no rule precludes either party from showing the illegality of the lease itself. On grounds of public policy, of the disability of the plaintiff, not of protection for the defendant, the court refuses to aid in enforcing a contract to do an illegal act, or one in which the consideration is illegal, however the illegality may be made to appear in evidence, receiving even

oral testimony to determine the status of a written contract in this respect. This contract imposed no obligation upon the plaintiff to maintain the dam in the manner stipulated, a nuisance which exposed him constantly to indictment, and which anybody having lawful occasion to use the creek might abate, committing no breach of the peace. It created no liability against the defendants, as tenants of the ice field thereby formed. In the most favorable light for the plaintiff, it was as if the owner of the soil under a public road should agree in a lease to fence off a part of it, and maintain the fence during the term, if his tenant would agree to pay him rent for the strip inclosed. It is clear that in such case the lease would be void as an illegal contract. If such a lessor, owning the fee of the road, had taken possession for breach of the terms of the lease by the tenant, certain claims on his part to the products of the soil might arise which the plaintiff is not here in position to assert, because he did not take actual possession of the whole pond, not of that part where the defendants cut the ice ; and, again, because he shows no property in the water of the creek, but only the right to use it, subject to the public easement, for the purposes of his mill.

It is true, in the present instance, that the *jus publicum* may be of trifling value. But the principle is an important one, protecting the openness of navigable waters, and must be observed. The ice interests of the State are becoming so valuable, that the legislature, which has the power to regulate common rights and privileges, will undoubtedly be disposed to yield them wherever it can be done safely and without public detriment, but the attempt to make this arm of the sea a place for cutting merchantable ice, without the aid of the legislature, is entirely impracticable.

The plaintiff's deed gave him no right to the ice cutting and no title to the ice. He shows no rightful possession except in accordance with the terms of his deed. There was no actual ouster of the defendants, from that part of the pond where they cut it. The right of the plaintiff to exclude them if they did not interfere with his mill privilege does not appear. *Cummings* v. *Barrett*, 10 Cush. 186, 189 ; *Paine* v. *Woods*, 108 Mass. 160, 173. They remained in possession and took the ice. If

either party has derived an advantage from the lease the law leaves them as they stand.

*Judgment for the defendants.*

APPLETON, C. J., WALTON, BARROWS, VIRGIN and LIBBEY, JJ., concurred.