LUCETTA M. BIGELOW v. THOMAS SHAW, JR., AND ARTHUR E. WEBSTER.

*Trespass—Property in ice—Riparian ownership—Right of flowage.*

1. Plaintiff was the owner of a parcel of land, subject to a right of flowage to a sufficient extent to raise a specified head of water for milling purposes by damming a small stream running through said land, and had been accustomed to harvest the ice forming over said flowed land, and dispose of the same for her own benefit. Defendants leased the right to cut and remove such ice from the owners of such right of flowage, and in the winter of 1884 and 1885 cut and removed a portion of the ice, for which alleged trespass plaintiff brought suit. The cutting and gathering of the ice in no manner tended to injure the water-power rights of defendants' lessors.

   *Held,* that the ice belonged to plaintiff, who could recover damages for its removal.

2. The owner of land covered by water is ordinarily the sole owner of ice formed upon such water ; and this ownership is not confined to ponds entirely on his land, but his riparian ownership of the bed of a stream will carry with it the right to the ice forming upon the surface of such stream, as far as such riparian right extends.[1]

3. A grant of " a right of flowage to raise the water in the flume at the mill 10 feet head " does not vest in the grantee any right in the land flowed, or in the water itself, but a mere right to raise the water to a certain head at the flume, and thereby overflow the land.

4. In the case of *Higgins v. Kusterer,* 41 Mich. 318, it was decided that, where the owner of the freehold upon which the ice had gathered chose to sell it by itself, it ought, for good reasons, some of which are stated in the opinion, to be classed as personalty. The ownership of the ice was held to be in the " possessor of the water," but such possession was derived solely from his ownership of the soil under the water, and said term, as used, means the owner of the water.

Error to Mecosta. (Fuller, J.) Argued January 27, 1887. Decided April 14, 1887.

---

[1] See *Clute v. Fisher,* 65 Mich. 48.

Trespass. Defendants bring error. Affirmed. The facts are stated in the opinion.

*M. Brown,* for appellants.

*Frank Dumon,* for plaintiff

MORSE, J. This action was brought in justice's court to recover damages against the defendants for entering upon a frozen mill-pond upon her lands, and cutting and removing ice during the winter of 1884 and 1885. The defendants gave notice that the title to the land would come in question, and filed the bond required by the statute in such case. Thereupon the justice certified the cause to the circuit court for the county of Mecosta, where a trial was had, and judgment rendered for the plaintiff for the sum of $50.

The circuit judge, Hon. C. C. Fuller, filed a written finding of the facts upon which he based his judgment.

This finding shows that the defendants, under a lease from Edward P. Shankwiler and David L. Garling, went upon that portion of a mill-pond which set back upon plaintiff's lands, and cut and carried away and disposed of for their own use 200 cords of ice, the value of which, as it lay in the pond, was $50. The mill-pond was formed by building a dam across Ryan creek, a small stream, not meandered, and emptying into the Muskegon river. The dam was built in 1866 by John Bigelow, the husband of the plaintiff. He then owned the north-west quarter of the north-west quarter, and the north-east quarter of the north-west quarter, and lot number 2, of section 24, and the south-east quarter of the south-west quarter of section 13, all in township 15 north, of range 10 west, in the county of Mecosta, Michigan. Ryan creek entered these lands on section 13, and ran through both the north-east and the north-west quarters of the north-west quarter of 24. Bigelow erected this dam for the purpose of ponding the water to obtain power to run and operate a flouring-mill on section 24.

In 1873 the plaintiff joined in a mortgage with her husband, executed by him to the Albion College Endowment Fund Committee, upon the north-east quarter of the north-west quarter, and said lot 2, of section 24. This mortgage also conveyed the right of flowage to raise the water in the flume at the mill 10 feet head, on the said lands retained by Bigelow, and not embraced in the mortgage, situated on sections 24 and 13. This mortgage was afterwards foreclosed, and the title to the lands, and the right of flowage, therein described, were acquired by said Shankwiler and Garling, under whom defendants claim the ice. Bigelow also, before the commencement of this suit, conveyed to his wife, the plaintiff, subject to the aforesaid right of flowage, a certain portion of the north-west quarter of the north-west quarter of section 24, and the same premises upon which the ice was cut by defendants. The plaintiff, therefore, at the time of the cutting of the ice, owned the land under said ice, and the defendants' lessors owned the right to flow water upon said land. The plaintiff forbade the cutting of the ice and the entry upon the land before the alleged trespass was committed.

The cutting and gathering of the ice on said mill-pond during the winter season of each year in no manner tended to decrease the capacity of said mill-pond to furnish power to run said mill, and was no injury to the water-power. It is also found by the circuit judge that Shankwiler and Garling have always exercised great care and caution to preserve the formation of ice on the mill-pond in question, but that, previous to the execution of the lease by them to the defendants, the plaintiff, acting by and through her husband as her agent, had been accustomed to cut and gather the ice upon that portion of the mill-pond which overflowed her land, and to sell and dispose of the same for her own use and benefit.

We think the circuit judge was right in his conclusion of law that the ice belonged to the plaintiff. Shankwiler and

Garling, in acquiring title under the mortgage to the Albion College Endowment Fund Committee, did not obtain any title in the land flowed, or in the water itself, but a mere right to raise the water to a certain head at the flume, and thereby overflow the land. While the proprietor of the soil thus overflowed could not draw this water off by drains or canals, so as to injure the use of the same by the mill-owners, he would have beyond question the right to use it for watering his cattle, or irrigating his lands, for domestic purposes, and for any reasonable profit or advantage which did not, in a perceptible and substantial degree, impair the operation of the flouring-mill. And the almost uniform authority is that he may take and carry away the water, when formed into ice, provided he does not thereby appreciably diminish the head of water at the dam of the mill-owner. *Cummings v. Barrett*, 10 Cush. 186; *Ham v. Salem*, 100 Mass. 350; *State v. Pottmeyer*, 33 Ind. 402; *Edgerton v. Huff*, 26 Id. 36; *Julien v. Woodsmall*, 82 Id. 568; *Brookville & Metamora Hydraulic Co. v. Butler*, 91 Id. 134; *Paine v. Woods*, 108 Mass. 160; *Stevens v. Kelley*, 78 Me. 445 (6 Atl. Rep. 868).

The owner of the soil under the water is ordinarily the sole and exclusive owner of the ice forming upon such water. And this is not confined to ponds forming or being entirely upon a person's premises, but his riparian ownership of the bed of the stream will carry with it the right to the ice forming upon the surface of such stream, as far as his riparian right to the soil extends. *Lorman v. Benson*, 8 Mich. 18; *People's Ice Co. v. The Excelsior*, 44 Id. 229; *Washington Ice Co. v. Shortall*, 101 Ill. 46; *Village of Brooklyn v. Smith*, 104 Id. 429. And in all the reported cases that I can find, except two, it is expressly held, in a case like the one at bar, that the land-owner has the exclusive right to the ice, and to gather and sell it for his own benefit, provided he does not thereby impair to a perceptible and substantial extent the flow of water for mill purposes, and that the mill-owner has

no right whatever to such ice. This right results from and grows out of the title to the bed of the stream, and such use of the water as results therefrom. *Stevens v. Kelley*, 78 Me. 445 (6 Atl. Rep. 868); Gould, Waters, § 191; *Paine v. Woods*, 108 Mass. 160, 172; *Brookville & Metamora Hydraulic Co. v. Butler*, 91 Ind. 134; *Dodge v. Berry*, 26 Hun, 246; *Marshall v. Peters*, 12 How. Pr. 218; *Washington Ice Co. v. Shortall*, 101 Ill. 46.

In *Mill River, etc., Manuf'g Co. v. Smith*, 34 Conn. 462, the court held that the mill-owner had an interest in the ice, and a right to have it remain where it was, upon the ground that removing it would injure the mill-owner by lessening his supply of water; but the court did not hold that the mill-owner had any right to remove and sell the ice himself. In this case we have a positive finding of the circuit judge that the removal of this ice did not "decrease the capacity of the mill-pond to furnish power to run said mill, and was no injury to said water-power." There is one other case which holds that the ice is the property of the owner of the easement to flow: *Myer v. Whitaker*, 5 Abb. (N. C.) 172. It is, however, the decision of a single judge, and the reasoning is not satisfactory. It was considered and disapproved in the same state in *Dodge v. Berry*, 26 Hun, 246.

In the case of *Wood v. Fowler*, 26 Kan. 682, the court held, in opposition to the rule prevailing in this State, that upon navigable streams the title of the riparian owner of the soil was limited to the bank of the stream, and that, therefore, the ice forming upon such streams belonged to the general public, or the state as the representative of that public; but the court recognizes the doctrine that, upon a stream not navigable, the ice would be the property of the riparian owner of the bed of the stream.

It is contended by the counsel for the defendants that this Court held in *Higgins v. Kusterer*, 41 Mich. 318, that ice was personal property, and belonged to the possessor of the

water, and that in the case before us the possession of the water where this ice was cut was in Shankwiler and Garling; that they could control this overflow at will, and without such overflow no ice could be produced. In other words, they had the right to flow these premises, and form thereby a pond of water thereon, but they were not obliged to do so. They could, if they saw fit, draw off the water to the natural bed and limit of Ryan creek, as it was before said dam was built, and prevent the plaintiff from gathering ice, by removing the water upon which it must form; and, having the right to move and control the water at their pleasure, they have the exclusive possession of it to all intents and purposes, which carries the ownership of the ice, as the counsel claims, from the language of the opinion in *Higgins v. Kusterer*.

The counsel also argues that if, for the purpose of forming ice upon the water, Shankwiler and Garling went to great care and expense to preserve the purity and enlarge the extent of its formation, and without their consent and co-operation no ice could be produced, they are certainly entitled to the ice as a matter of simple justice and equity, as well as in law.

We do not consider that the case of *Higgins v. Kusterer* is at all opposed to the authorities heretofore cited. It was simply decided in that case that, where the owner of the freehold upon which the ice had gathered chose to sell the ice by itself, it ought, for good reasons, some of which are stated in the opinion, to be classed as personalty instead of realty. The ownership of the ice in that case was held to be in the person possessing the water, but his possession of the water was derived solely from his ownership of the soil under the pond which contained such water. The term "possessor of the water," as used in the opinion, means the owner of the water.

In the case at bar no one had the exclusive possession or ownership of the water as before shown. It was in a stream in which others had rights as well as the plaintiff and the

mill-owners. The use and possession of the waters of Ryan creek by either must be subject at all times to the rights of other proprietors of its banks and bed, both above and below them, from its source to its end. Shankwiler and Garling had no such possession of the water as would give them any absolute ownership therein. They acquired by their title to the mill, under the mortgage foreclosure, only the right to use the water for mill purposes, and to overflow the plaintiff's land if they saw fit. If they did not choose to operate their mill, or could operate the same without any overflow upon plaintiff's premises, then, of course, the stream would take its natural course, and keep within its natural limit upon plaintiff's land. In that case she could only obtain ice as it gathered over the bed of the creek, as none would form anywhere else upon her land, but she would be entitled to what ice was produced upon her premises.

If Shankwiler and Garling saw fit to use the overflow, as they did, then plaintiff would have a right to the ice upon the overflow by the same rule and principle that would give it to her in the channel of the creek. The ice forming upon the waters of the stream where it ran through the plaintiff's premises, without any overflow by the dam, would belong to her by reason of her proprietorship of the soil, although the waters of such creek could not be diverted by her to the injury of the owners of the stream below her. Upon the same principle, the ownership of the soil beneath the overflow would endow her with the exclusive property in the ice upon such overflow. The equity, if any, resulting from care on the part of Shankwiler and Garling to preserve the purity and formation of ice upon the pond, is not sufficient to change the settled rule as to its ownership.

The judgment of the court below is affirmed, with costs.

The other Justices concurred.