IN THE

# SUPREME COURT

OF THE

## STATE OF NEW-YORK,

IN FEBRUARY TERM, 1824, IN THE FORTY-EIGHTH YEAR OF OUR
INDEPENDENCE,

---

JACKSON, ex dem, YOUNG & DEVEREUX, against CAMP.

EJECTMENT, for part of lot number 63, in the 20th *township*, in *Sangerfield*, in the county of *Oneida ;* tried before his Honor (the late) Mr. Justice PLATT, at the *Oneida* Circuit, *November* 19th, 1821.

It was admitted on the trial, that the lessors of the plaintiff owned a part of lot number 63, and that the defendant owned a part of lot number 62, in the 20th *township.* The lands of the respective parties adjoined each other upon a line running east and west, separating lot 63 *from* 62.

*To constitute an adverse possession of land, an entry under claim of title is, in general, sufficient; and it is not material whether the title prove to be valid or not:*

*But if the claim is not founded on a* deed of conveyance, or a writing, the possession is limited to actual occupancy and substantial enclosure, which must be definite and notorious.

To support a constructive possession beyond these, grounded on an actual occupation of part only, it is essential that the writing relied on as evidence of title, should include the land not occupied.

Where one makes a contract to have a deed, though he enter into possession of the land described by it, he is not in a situation to hold adversely, until the condition upon which he contracts to have his deed is fulfilled :

For such a possession is not hostile in its inception.

To bar a right of entry, a possession must not only be hostile in its inception, but must continue so for 20 years,

Where one contracts for a deed, which is afterwards executed, this extinguishes all claim under the contract, even though the deed vary from the contract. The contract becomes a nullity;

And, accordingly, the extent of the adverse possession can no longer be determined by the contract, but must be determined by the deed.

It is a general rule in the lines of description, contained in a deed of conveyance, that what is most material and certain shall control that which is less so. Thus, a river, a known stream, a spring, or even a marked tree shall control both course and distance.

The lessors of the plaintiff contended on the trial, that the defendant had wrongfully extended his possession over this line upon the land of the lessors in lot 63. The defendant, 1st, denied this ; and insisted, 2d, that if he had so encroached, his possession having been adverse for more than 20 years, barred the plaintiff's action.

A verdict was taken for the plaintiff, subject to the opinion of the Court upon a case.

For the purpose of enabling the Court to determine the extent and nature of the adverse possession, and to settle the location, a map was made a part of the case. The principal boundaries of the premises immediately in question, were denoted by letters placed upon this map, and lots 54, 55, 62 and 63, adjoining each other, were laid down and subdivided, so as to exhibit the position of the premises in relation to other parts of the tract. This map was referred to in the argument, and (as will be seen) in the opinion of the Court. But though the map be material in reference to the interests of the parties immediately concerned in the cause, and tho' the details of fact may not be readily comprehended without it ; yet it is conceived that the principles of law, as laid down and applied by the Court, will be sufficiently understood by the profession, without seeing the lines upon which the questions of fact depended. The evidence contained in the case was voluminous, and need not be stated at length ; and the correct abstract given by the Judge, who delivered the opinion of the Court, renders a summary unnecessary in this place.

The cause was argued at the last *May* term, by *H. R. Storrs*, for the plaintiff, and *Talcott*, (Attorney General) for the defendant.

*Storrs*, for the plaintiff, cited *Jackson* v. *Harter*, (14 *John.* 226 ;) *The same* v. *Waters*, (12 *John.* 365 ;) *Ricard* v. *Williams*, (7 *Wheat. Rep.* 59 ; 1 *Phil. Ev.* 187-8,) and *Pray* v. *Pierce*, (7 *Mass. Rep.* 381.)

*Talcott*, (Attorney General) for the defendant, cited *Tomb, q. t.* v. *Sherwood*, (13 *John.* 289 ;) *Stuyvesant* v. *Tompkins & Dunham*, (9 *John.* 61.) And now,

ALBANY,
Feb. 1824.

JACKSON
v
CAMP.

WOODWORTH, J. delivered the opinion of the Court:

The outlines of township No. 20, and lines to divide it into quarters, were run by the Surveyor General. The lots, though laid down on the map, were not actually surveyed; the courses only being marked by monuments on the quarter lines. John Tayler and others became proprietors of this township. Sanger and Morgan, in 1791, were agents to survey out and sell. They employed one Smith to survey, according to the Surveyor General's survey or map. He committed so many mistakes, that no return was made. In the year following, being 1792, he made a new survey, which was acted upon. ever after, by the proprietors. The controversy in this cause is as to the line between lots No. 62 and 63—the defendant claiming to hold up to the old line, as the north line of 62, and the plaintiff to the new line, as the south line of 63. The first is the erroneous line run by Smith—the other is the correct line, according to the second survey. It appeared, that on the 7th October, 1791, Dyer and Peck had their names entered in Sanger's book of sales, for lot 62. On the 7th April, 1792, a payment of £20, was made to Sanger. He gave a receipt, which specified the price and terms of the contract, and referred to the Surveyor General's survey and map. The township was not divided among the proprietors, until after the completion of the second survey.

On the 16th December, 1794, John Tayler conveyed lot 62 to Dyer and one Thompson. The lot is described as bounded on the north by 63, on the west by 55, on the east by parts of 69 and 70, and on the south by 61. On the 26th March, 1796, Dyer executed to the defendant a bond, conditioned for the conveyance of a part of lot 62, containing 90 acres, described as beginning at the northwest corner of the lot. On the 22d April, 1797, Dyer gave the defendant a deed, described as in the bond, except as to the place of beginning, which is in the following words: " beginning at the northwest corner of said lot, at a stake and stones, and the northwest corner of the improvements on said lot." The stake and stones were set by Smith, at this place, in his first survey. He ascertained the corner by running a line from the Surveyor General's stake, (set for the south-

west corner of 54, and the northwest corner of 55,) on the quarter line, to the stake and stones put up for the northwest corner of 62. The old line, so called, between 62 and 63, corresponds with the Surveyor General's stake on the quarter line. *Smith* ran according to the Surveyor General's stakes or monuments, but could not make some of his lines meet and close. In his second survey he departed in some instances from the stakes, from regard to distances. In *March* or *April*, 1792, *Dyer* commenced an improvement at the northwest corner, as fixed by *Smith* ; it contains 3 acres, 2 rods and 15 perches. The residue of the land in dispute, and lying east, is wood land. In running the north and south lines of the lots in 1791, *Smith* took a wrong stake, belonging to another township, as a place of beginning, in consequence of which, the line running north and south as the division line between lots 54 and 63, and 55 and 62, is 35 rods too far west. About 20 years ago, all that part of 54, which lies between the first line run north and south and the second, were conveyed to *Benjamin Knowlton*, under whom the plaintiff claims. *Samuel Stevens*, who owns a part of 62 next east of the defendant, claims only to the new line north, and *R. Patrick*, still farther east, holds in like manner. *Burch*, next east of the plaintiff in 63, holds down to the new line. They considered it the true line.

When *Dyer's* name was entered in the agent's book, for lot 62, no description of the lot was given. When he made a payment, the receipt referred to the Surveyor General's survey and map. By the act of *25th February*, 1789, (2 vol. Greenl. ed. 265) the Surveyor General was directed to erect a mark or monument at the ends of the outlines of the township, and at the termination of every 50 chains between the same, where local circumstances would admit the outlines to be straight, and then to run a line parallel to any of the straight lines of the township, and another line at right angles with such parallel line, to be marked in like manner, so as to divide the township into four equal parts.

When *Smith* made his second survey in 1792, by running the east and west lines according to the stakes, they did not meet; it became therefore impracticable to run out the lots in this manner; some of the stakes on one line, in some in-

stances, would be more than 50 chains apart. On the other line, to which the line dividing the lots was to be extended, they might be exactly 50 chains from each other, and thus running a line from one stake, would not, in every instance, strike the other. In the second survey, where the lines would not meet the stakes, he regarded distance, thereby making the lines close.

The first contract with *Dyer*, undoubtedly gave him as the north line of 62, a line to be run east from the Surveyor General's stake on the quarter line. His first improvement, however, was not on lot 62. If the north line is run in this manner, the north west corner would be at the letter B. It is abundantly proved, that the north and south line running from the corner at A, is not the west line of lot 62 and 63, but is 35 rods too far west—so that as to the small parcel improved, *Dyer's* contract did not cover it ; but the deed from *Dyer* to the defendant, does include a part of the improvement, as will hereafter be shewn. The actual occupancy, for more than 20 years, is sufficient, thus far, to defeat the plaintiff's recovery. Between this improvement and the line from B to C, (the true division line between lots 54 and 63) there remains a small parcel of land not improved, of which the defendant also claims to be in possession ; to a part of this he does not make out a good adverse possession, because not included within the bounds of his deed. An entry under claim of title, is generally sufficient, and it is not material whether the title prove to be valid or not. If the claim of title is not founded on a deed or writing, the possession is limited by actual occupancy, and substantial enclosure, definite and notorious, according to the doctrine laid down in *Jackson* v. *Schoonmaker*, (2 *John.* 230.) If the claim is under a writing, as in this case, possession and improvement of part of a lot will give a valid constructive possession of the residue, although not improved ; but it is essential to support such constructive possession, that the writing relied on as the evidence of title, should include within its boundaries, the land not occupied and improved. If it does not, it would be absurd and unjust to allow a tenant to hold adversely, land

Entry under claim of title, generally sufficient to constitute an adverse possession, and it is not material whether the title be valid or not.

But if claim is not founded on a deed or writing, the possession is limited to actual occupancy, and substantial enclosure, definite and notorious.

JACKSON
v.
CAMP.

A mere contract for a deed, though the purchaser enter under it, does not place him in a situation to hold adversely, till he perform the condition of the purchase by paying the purchase money ; such a possession not being hostile in its inception.

To bar an ejectment, the possession must not only be hostile in its inception, but must continue so for 20 years :

And where one contracts for a deed, which is afterwards executed, this extinguishes all claim under the contract, even though the deed vary from the contract ;

And the extent of the adverse possession must be regulated by the deed ; not the contract.

on which, by his own shewing, he is merely a naked possessor. This Court has so decided in *Jackson, ex dem. Gilliland,* v. *Doty & Woodruff,*(a) at the last *August* term. The same principle was decided previously, and referred to in the last case. *Dyer's* contract does not include this parcel lying in 54 ; there could not be any claim of title under it, to that extent.

There are, however, conclusive objections against any claim of adverse possession under the contract made with *Sanger.* That agreement did not place *Dyer* in a situation to commence holding adversely, until he performed the condition. The land still belonged to the proprietors of the township. Whether he ever would perform was contingent. There is no evidence, that previous to the deed given by *Taylor* in 1794, *Dyer* pretended he had a title to the lands, or supposed that the receipt given in 1792, conferred any. He entered on the lot, it is true, but it was necessarily subject to the right of turning him off, if he neglected to make full payment. The possession, therefore, when taken, had not the characteristics to constitute it adverse. It was not hostile in its inception. On the non-performance, *Dyer* would become liable to be turned out as a trespasser, and responsible in that character for the mesne profits, as in *Smith* v. *Stewart,* (6 *John.* 46.) So also in *Jackson* v. *Bard,* (4 *John.* 230,) where A went into possession under an agreement made with B to purchase : afterwards C went into possession under an agreement with A, for the purchase. Subsequent to the entry of C, A took a deed from B, and gave a mortgage. It was held this was not an adverse holding : it was not hostile to B's title.

There is another objection against setting up any adverse possession under the contract. Such possession must not only be hostile in its inception, but must continue so for 20 years. *Brant* v. *Ogden,* (1 *John.* 156.) When *Dyer* received a deed for lot 62, the contract became merged. If the boundaries of the lot, as contained in the contract, varied from the deed, and included more land, by accepting the deed, all claim under the contract was abandoned. Thus in *Houghtaling* v. *Lewis,* (10 *John.* 297.) it was held, that a deed accepted in pursuance of articles of agreement, is;

(a) *Ante,* 276.

*prima facia,* evidence of the execution of the whole contract ; that the rights and remedies under it are determined, and the original contract becomes null and void ; so that if the quantity of land conveyed, fall short of that agreed to be conveyed, no action lies upon the original covenant. Nothing can be more reasonable than this doctrine. It is in point, as to this part of the case, and confines both the title and possession to the lot as described in the deed from *Tayler.* The right to the 3 acres rests on other ground already shewn, to wit, actual occupancy. The description of the lot as conveyed by *Tayler,* makes the new line the northern boundary. That is the legal construction ; for it appeared, that the proprietors divided and have uniformly acted upon the second survey : consequently, *Tayler* received the lot according to that survey. It would be contrary to the acts and intentions of the parties, and not required by the words of the deed, to say, that " north by lot No. 63," did not intend the second line run by *Smith,* which *Sanger* testifies was the true line. There is no reference to the Surveyor General's survey in this deed. If the deed of *Tayler* included the land between the old and new line, there could be no question as to the possession ; for the real title would be in the defendant : this is not pretended—he relies on possession only. A few years since, the defendant pointed out the corner of lot 62, to *Salsbury,* which is at letter D, on the map, and corresponds with the second survey. I think I have clearly shown, that *Dyer* could not have a constructive possession between the two lines, his deed not including the land.

It remains to ascertain the extent of the defendant's adverse possession. The deed from *Dyer* to the defendant, is dated *April* 22, 1797. The description given as the north west corner of the lot, I admit, is on the old line, but within the bounds of lot 54. This was colour of title for the defendant, and sufficient tor the commencement of a good adverse possession of the land comprised within its boundaries, but no more. Whatever may have been *Dyer's* title, or possessory right, he professes to sell, and the defendant to buy, no more than according to this description. The deed is the only evi-

dence of any right in the defendant. When he claimed to hold to the old line, it was under title derived from this conveyance. If *Dyer* had a possessory right remaining in him under the contract, he does not transfer that to the defendant, and without some transfer, the defendant could not succeed to it. But it is evident, the parties acted under different views. They considered the deed as ample for their purpose. The question, then, is brought to this : How must the northern boundary in the deed to the defendant be run ? The deed says, " running east until it strikes the west line of *William F. Stevens'* land." The same is now owned by *R. Patrick.* The line of *Stevens* terminates on the new line, for his land is in 62, and it has already been demonstrated, that the new line is the true north line of that lot, according to the deed of *Tayler.* *Patrick* derived title from *Dyer* under that deed ; the true line of *W. Patrick* is reduced to certainty, and to that the defendant's deed refers. *Patrick* testifies, that *William Stevens* had always informed him the new line was the true one. This point being established, the course must yield to the object, at the termination of the line, which is fixed and certain. The line must be run from the point A, on the map, to the north west corner of *W. Stevens'* (now *R. Patrick's*) land.

In the lines of a deed, that which is most material and most certain, shall control that which is less material and less certain, shall control that which is less certain, shall control both course and distance. *Newton* v. *Prior,* (7 *Wheaton,* 10.) So also in *Preston* v. *Bowman,* (6 *Wheaton,* 582,) it is laid down as an universal rule, that course and distance yield to natural and ascertained objects. These principles decide how these lines are to be run. An east line will never reach the object given—it must be considerably south of east. It must be a direct line from A to the line of *W. Stevens,* and consequently leaves a portion of the wood land claimed by the defendant without the bounds of his deed. To that part he cannot establish an adverse possession, while the land is not improved. The residue lying between the old and new line, is protected by an adverse possession of more than 20 years.

I am of opinion that judgment be entered for the plaintiff.

Judgment for the plaintiff.