WICKHAM WHEELER, Respondent, *v.* ELVIRA N. SPINOLA, Appellant.

| 54  | 377 |
|-----|-----|
| 134 | 360 |
| 54  | 377 |
| 143 | 526 |

The rule that the proprietors of lands, bordering upon streams and waters in which the tide ebbs and flows, own only to high-water mark, is not applicable to a case where, by the cutting of a channel between a fresh-water pond and some body of salt-water, the water of the former becomes salt, and the tide ebbs and flows therein. In such case the rights of the riparian owners are not affected by the change.

A boundary upon a natural pond or lake carries title, not to its center, but only to low-water mark. The rule as to an artificial pond is otherwise; a boundary thereon generally, in the absence of other controlling facts, carries title to the center.

The entry upon land once a year for over twenty years, and the cutting and removal of grass therefrom by a party who has not inclosed or cultivated it, and where it is no part of a known farm or lot occupied by him, is not sufficient to confer a title by adverse possession.

Plaintiff's deed contained a description, in substance, as follows: a certain piece of meadow or land covered by water lying in F. pond (a natural pond), beginning at a certain marked cedar tree, running thence south eighty-three and one-third degrees west, four chains through lands of one J., to a stake; thence north two chains and thirteen links, to a stake; thence north fifty-one and a half degrees east, to a tree. *Held*, that

the deed could not be the basis of a constructive adverse possession under the statute (2 R. S., § 294; Code, § 83), as against J. or his grantees, of land between the first-mentioned line and low-water mark of the pond, as the deed only purported to convey land in the water, and so did not include, in the general description, land above low-water mark; and as the description of said line was an admission that J. owned on both sides thereof, and so it was no boundary line; also that the lines given inclosed no land, and gave no claim of a title founded upon a written instrument.

(Argued June 10, 1873; decided September term, 1873.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial district, in favor of plaintiff, entered upon an order denying a motion for a new trial and directing judgment on a verdict.

This was an action for trespass, and was originally commenced in Justice's Court. A plea of title having been there interposed, the action was discontinued and commenced in the Supreme Court. The sole question litigated at the trial was one of title. The *locus in quo* was described in the complaint as follows: "All that tract of meadow land situate at Flax pond, near Craine Neck, town of Brookhaven, county of Suffolk, and State of New York, bounded north by the low-water mark of Flax pond, east by other land and meadow of Wickham Wheeler, south by high-water mark of Flax pond, at the piece of upland known as the common land, at the north end and westerly of Flax Pond lane, and west by a line running north, across Flax pond, from a point on said common land where a stake formerly stood, and near where two marked cedar trees now stand, said north line being the division line of Flax pond."

The defendant gave the following evidence to establish her title: A deed from Sidney W. Darling and Clarissa Darling to Elvira N. Spinola, dated December 10th, 1860, conveying that tract of land situate at Craine Neck, bounded "north by Flax pond, east by Flax Pond lane and land of Wickham Wheeler, south by land of William B. Dickerson, and west by land of said Elvira N. Spinola;" the will of Peter Dar-

ling, dated in 1843, devising to the grantors in the above deed all his real estate; a deed from Mary Jones to Peter Darling, dated September 8th, 1827, conveying land situate at Craine Neck, bounded as follows: "beginning at a certain apple tree in the old orchard, so called, from thence running south to David Dickerson's line, from thence running east to Samuel W. Harned's line, thence northward, by the Flax Pond lane, to the Flax pond, then westwardly to a certain stump, from thence south to the aforesaid apple tree, together with all the meadow and salt marsh lying at the foot and adjoining said homestead; said meadow running from the foot of said upland into the Flax pond;" a deed from Benjamin Jones and wife to Mary Jones, dated December 27th, 1825, conveying all that piece of land situate in the town of Brookhaven, and bounded south by the land of David Dickerson, west by the land of Mary Jones, north by Flax pond, and east by the land of Charles Jayne, containing by estimation thirty acres; will of Vincent Jones, dated December 28th, 1818, devising to Benjamin Jones all that tract of land known as the pond lot, beginning at the fence between the pond lot and the old orchard, from thence a straight line to the west end of David Dickerson's land, thence eastwardly by David Dickerson's land, northwardly by the Flax Pond lane, and westwardly by the pond to the fence between the old orchard and pond lot, the place of beginning, together with all the meadow adjoining the said land or pond or pond lot, so called; a deed of Zachariah Hawkins, Elizabeth Hawkins and Phebe Smith to Vincent Jones and Benjamin Jones, dated March 29th, 1786, conveying all that tract of land at Craine Neck, bounded as follows: "beginning at the north end of the Flax Pond lane, and thence southerly with said lane, in the line of the land that was my father's, and given to me by his will, southerly and westerly until it comes to the bars adjoining the bank lots, which are the property of my brother, John Hawkins; thence on the north line of said bank lots, westerly to the cliff, thence with the cliff northerly, easterly, and southerly, around the extreme point of the neck,

until it comes to Wood island, the property of said John Hawkins; thence across the beach northerly to the north-west end of the little pond, then with the said little pond and the great pond to the north end of the line aforesaid."

The defendant then called the following witnesses: Sidney W. Darling, who testified in substance that he was grantor in the deed to the defendant, and he and his father before him occupied the premises described in the deed; that he knew the premises in dispute, and that he and his father always cut the salt meadow thatch on their premises; Vincent Dickerson, who testified that he was over fifty years old; that he knew the premises in dispute, and had known them so long as he could remember; that he lived on them with his grand-parents, Vincent and Mary Jones, when he was twelve years old, and until he was sixteen; that his grand-father cut the grass on the disputed piece, and built a water fence on the west side of Flax Pond lane in conjunction with Mr. Smith, who occupied the land east of it; Benjamin Jones, who testified that he was seventy-six years old; that he was born and brought up on these premises; that there was a water fence on the west side of Flax Pond lane as long as he could remember; that his line went to this fence, which was made between the two owners, and that he always cut the thatch up to this fence on the west side; that the persons who owned the land on the east side only claimed to this fence, and did not dispute his title to the land on the west side of it; that Flax pond was formerly fresh-water, and that then the water did not come upon the land in dispute, and then there was no thatch there; that an opening was made to this pond when he was thirteen years old to let in the salt-water; and that, thereafter, the water in the pond was salt; and tide ebbed and flowed in it; that he cut most of the trees between high and low-water mark, west of the water fence.

Upon substantially this proof the defendant rested her case, and the plaintiff then gave the following proof: A deed from the trustees of the town of Brookhaven to Isaac Brewster, Stephen Edwards and Ebeneezer Smith, dated November 2,

1819, signed by Thomas S. Strong, president of the trustees, with the corporate seal, conveying the title of the town in certain premises known and distinguished by the name of Flax pond; a deed from Isaac Brewster and wife and Stephen Edwards and wife to Charles Jayne, dated August 2, 1825, conveying all that part of Flax pond, covered with water, beginning "at a certain cedar tree standing in the fence between the land of Charles Jayne and Benj. Jones, Jr., thence south eighty-three and one-third degrees, west four chains and sixty links through said Jones' land, to a stake in the upland; thence north two chains and thirteen links to a stake; thence north fifty-one and a half degrees east to a tree standing in the water fence between the land of Gilbert Floyd and Charles Jayne." A deed from Ebeneezer Smith and wife to Charles Jayne, dated March 24, 1825, conveying certain lands, bounded northerly by Flax pond, westerly by Flax Pond lane, etc., and also the one equal undivided third part of the easterly half of the meadow, marsh or other land covered with water, commonly called the Flax pond, owned in common with Isaac Brewster and Stephen Edwards; a deed from Charles Jayne and wife to Samuel W. Harned, dated September 21, 1826, conveying land bounded northerly by Flax pond, and westerly by Flax Pond lane, etc., "and also a certain piece of meadow or land, covered with water, situate and lying in the Flax pond, bounded as follows, viz.: Beginning at a certain marked cedar tree standing in the fence between the land of the said Charles Jayne and Benjamin Jones, Jr., and then running south eighty-three and one-third degrees, west four chains and sixty links through the said Jones' land to a certain stake on the upland, from thence north two chains and thirteen links to a certain stake, and from thence north fifty-one and a half degrees east to a tree standing at the upper part of the water fence in the corner, between the land of Gilbert Floyd and the said Charles Jayne, the said premises being more known and distinguished by the name of Ogelthorpe Hall or Mount Burrows;" a deed from Sillick Nichols and wife and Samuel W.

Harned to Joseph Tooker, dated March 6, 1829, conveying same premises; a mortgage given by Charles Jayne and wife to Richard Udall, dated March 29, 1826, conveying the same premises conveyed to said Jayne by Ebeneezer Smith and wife, March 24, 1825; a deed under decree of foreclosure of said mortgage by a master in chancery, to Wickham Wheeler, dated December 24, 1833, conveying all the premises mentioned and described in the above-mentioned deed from Jayne to Harned.

The plaintiff then called witnesses who gave evidence, substantially, as follows: Wickham Wheeler, plaintiff, testified that he had owned the farm adjoining the premises in dispute since 1833; that he never knew any water fence on the west side of Flax Pond lane, except what Sidney Darling put there, and that remained there but two days, when he pulled it away; that he had mowed the disputed piece every year but two, the year Darling cut it, and the year defendant cut it. William C. Tooker testified that he had known the disputed premises for forty years; that he cut the hay upon these premises for Joseph Tooker when he resided upon the farm, now occupied by the plaintiff, two years; that he never knew any water fence on the west side of Flax Pond lane since plaintiff occupied his farm. Samuel Floyd testified that he had known the disputed premises thirty or forty years; that he had seen Joseph Tooker and plaintiff on these premises cutting hay some years ago; that he once mowed hay for Peter Darling, and cut only to the west bound of these premises, and that Darling showed him the bounds at that place, between his land and lands of plaintiff, and that he always understood that to be the line; that when he was a boy there was a water fence on the west side of the land. Richard W. Wheeler testified that he was a surveyor; that he had made a survey and map for the plaintiff according to the description in his deed. This was, substantially, all the evidence on the part of the plaintiff, and the defendant then called Benjamin Floyd, who testified that he had known the premises in dispute for forty years; that there was a water

fence when he was a boy on the west side of the lane, and that he never knew plaintiff to cut the meadow on the disputed piece. The defendant then put in evidence a decision of commissioners appointed by the owners of the pond, dated April 12, 1815, dividing the pond as follows: "The bound is a stake set on the bank on the south side of the pond, which is due west from a certain cedar tree standing in the fence between the land of the said Vincent Jones and the Flax Pond lane, which said stake stands five chains and five links due west from said tree, and from said stake a due north line to the northernmost side of said pond and marsh," and the executors of Stephen Hulse chose the westernmost half, and the president of the trustees of the town of Brookhaven chose the easternmost half, and quitclaim deeds were executed accordingly.

Upon this evidence, the judge charged the jury "that if the plaintiff had cut the grass in the manner stated by him in his testimony, and only with the interruption stated by him, he is entitled to recover." To this charge defendant excepted, and she requested the judge to charge the jury that the plaintiff was not entitled to recover, unless they found that the plaintiff's deed covered these premises. The judge refused so to charge, to which refusal the defendant excepted. The judge then charged the jury that the plaintiff's deed did cover the premises, and to this defendant excepted.

Further facts appear in the opinion.

*Thomas S. Strong* for the appellant. The judge erred in charging the jury that plaintiff's deed covered the premises. (*Gardner* v. *Heart*, 1 N. Y., 528.) In the construction of this deed the intention of the parties should govern. (*French* v. *Carhart*, 1 N. Y., 96; *Hathaway* v. *Power*, 6 Hill, 453.) Plaintiff acquired no title to the shore between high and low-water mark by adverse possession. (2 R. S. [marg.], 294; Code, § 83; *Lane* v. *Gould*, 10 Barb., 254; *Jackson* v. *Woodruff*, 1 Cow., 276.) The occasional cutting of the meadow by plaintiff, without evidence of title, is not enough to entitle

plaintiff to maintain the action of trespass. (8 Cow., 115; *Lane* v. *Gould*, 10 Barb., 254.)

*J. Lawrence Smith* for the respondent.

EARL, C. The complaint alleges that on the first day of September, 1869, the plaintiff " was, and for a long time previous had been, and since that time has been and is now the owner in fee simple and possessed of all that tract of meadow land" described. The answer, without denying anything alleged in the complaint, alleges title to the lands in the defendant.

The plaintiff's possession during the period mentioned in the complaint is not denied and cannot therefore be disputed. Upon the pleadings, therefore, the plaintiff had a *prima facie* case; and at the trial the defendant held the affirmative, to defeat the plaintiff by showing title in herself. This she undertook to do, and the real question to be determined is whether she succeeded. The case was either loosely tried or imperfectly reported. Flax pond is mentioned in all the conveyances, and the rights of the parties may depend somewhat upon its character and the use to which it was subjected, and yet we are not informed of any use to which it was put, nor of its size, nor of its location in reference to the ocean or some arm or inlet of it, nor whether it is a natural or artificial pond. I will assume, however, as most probably true, that it is a natural pond. Prior to about the year 1800, this was a fresh-water pond, and at that time some of the parties interested therein, by cutting or deepening a channel communicating with some body of salt-water, let the salt-water into it, and thereafter the water therein was salt, and the tide ebbed and flowed therein. We are cited to no authority showing that the rights of the parties interested in the pond were in any way modified by this change in its character, and I apprehend none can be found. Those who owned the bed of the pond, as well as the riparian owners, must have had the same rights

afterward as before.   The owners of the bed of a fresh-water
pond certainly cannot, by letting into it the water of the
ocean, extend their right of ownership to the high-water
mark of flood tide.   The boundaries between them and the
riparian owners must remain the same.   The proprietors of
land bordering upon streams and waters in which the tide
ebbs and flows, own only to high-water mark, and the land
below that belongs, in this country, to the people.   But this
rule of ownership cannot apply to this pond.   It must be
treated for all the purposes of this case as if it had remained
a fresh-water pond.   Neither can the rule as to riparian
ownership be applied to this pond which is applied to
ordinary fresh-water streams.   A boundary upon it does
not carry title to its center but only to low-water mark.
Such is the rule as to boundaries upon natural ponds
and lakes.   (*Angell on Water-courses*, §§ 41, etc.; *Canal
Commissioners* v. *The People*, 5 *Wend.*, 423, 446; *Champlain
& St. Lawrence Railroad Co.* v. *Valentine*, 19 Barb., 484;
*Waterman* v. *Johnson*, 13 Pick., 261; *Bradley* v. *Rice*, 13
Maine, 198.)   In *Waterman* v. *Johnson*, Chief Justice SHAW
says: "A large natural pond may have a definite low-water
line, and then it would seem to be the most natural construc-
tion, and one which would be most likely to carry into effect
the intent of the parties, to hold, that land bounded upon such
a pond would extend to low-water line; it being presumed that
it is intended to give to the grantee the benefit of the water,.
whatever it may be, which he could not have upon any other
construction.   The rule as to a boundary upon an artificial
pond is otherwise.   Such a boundary, generally, in the
absence of other controlling facts, carries the land to the cen-
ter of the pond."

With these rules of law in view, it is not difficult to deter-
mine the rights of the parties in this action, upon the facts
appearing.   The defendant traces her title back to 1786, and
in all the deeds the boundary on the north side is Flax pond.
The deeds convey a farm on the westerly side of Flax pond
lane; this lane ran northerly to the pond, and on the west

side thereof there was at an early day kept up, at least for many years, a fence extending to the pond. There does not appear at any time to have been any fence between the disputed piece and the other land of the defendant. That piece was conveyed from time to time as a portion of the farm now owned by her, and there is very little if any dispute that, prior to 1833, the owners of that farm always cut the thatch which grew thereon. The deeds, therefore, under which the defendant holds her title, carry her ownership to low-water mark; and as the thatch was cut above low-water mark, and mostly if not wholly between high and low-water mark, there can be no question that she shows title to the *locus in quo*, which must protect her unless the plaintiff has shown a better title. It seems to be undisputed that, in 1815, one Hulse and the town of Brookhaven owned the pond, and in that year the pond was divided between the owners; the easterly half, opposite the land in dispute, falling to the town of Brookhaven. In 1819 the town conveyed its half to Brewster, Edwards and Smith. In 1825 the latter parties conveyed to Jayne, and in 1826 Jayne mortgaged an equal undivided third part of the premises conveyed to him to one Udall, and the plaintiff gets his title by a foreclosure of this mortgage in 1833. So that, if the plaintiff has any paper title whatever to the disputed piece, it is only to one undivided third part thereof. But I will lay no stress upon this defect in his title, and will treat the case as if he held the whole of the title which the town of Brookhaven conveyed. What title did he get through these conveyances? He certainly got no greater title than the town formerly had, as he derived all his paper title from that source. The town simply owned the bed of the pond. It never owned any land above low-water mark. Prior to 1800, when the salt-water was let into this pond, the land in dispute formed no part of the bed of the pond, and the water did not cover it; it is only covered now at flood-tide. It is clear, therefore, that the plaintiff shows no title to the land in dispute. He can trace what title he has only to 1815, and, prior to that time,

those under whom the defendant holds were in possession of the land under conveyances carrying them to low-water mark on the pond.

It only remains to be considered whether the facts testified to by the plaintiff show title in him by adverse possession, so as to justify the charge of the judge. Upon this question we may lay out of consideration the admission in the pleadings that for some years before the commencement of the action the plaintiff was in the actual possession of the premises, because the facts alleged in the complaint do not show an adverse possession. The fact admitted is simple possession, nothing more. We must, then, look at the facts proved, as we must assume the jury to have found them ; and they are, · that this piece of land was never inclosed by the plaintiff, never cultivated and never possessed by him in any way, except that once a year, since 1833, he entered upon it and cut and removed a load or two of thatch. It was no part of a known farm or lot occupied by him. So far as he can claim to have any conveyance of it, it was a separate lot, separately described, of which the only use he made was as above specified. I shall spend no time in showing that such a temporary occupancy for such an unimportant purpose, really nothing but trespasses repeated from year to year, can confer no title by adverse possession. A decision that it could would be quite novel, and wholly unsupported by any authority.

I have, so far, treated this case as if the plaintiff's deed nominally covered the *locus in quo*. But it may well be claimed that it does not. The description therein contained, after the description of another piece, is as follows : "Also a certain piece of meadow or land covered with water, situate or lying in the Flax pond, so called, and bounded as follows, viz. : Beginning at a certain marked cedar tree standing in the fence between the land above described (now plaintiff's), and the land of Benjamin Jones, Jr. (now defendant's), and then running south eighty-three and one-third degrees west · four chains and sixty links, through the said Jones' land to a

certain stake in the upland, and from thence north two chains and thirteen links to a certain stake, and from thence north fifty-one and a half degrees east to a tree standing at the upper part of the water fence in the corner between the land, late of Gilbert Floyd, now deceased, and the said first mentioned premises." It will be seen, in the first place, that the land is described as covered with water and lying in the pond, and hence it could not include the land in question, not covered with water, lying above low-water mark, and thus belonging to the riparian owner. In the next place, the lines given do not describe or inclose any land. The first course runs nearly west, forming the alleged southern boundary of the land, *through Jones' land,* which now belongs to the defendant. If it run through Jones' land, it must have divided it, leaving some thereof on both sides of it. How much did it leave on the north side, and how much on the south side? The very description of the line is an admission that Jones owned on both sides of it, and hence this line gives no boundary. The next line runs due north, and then north fifty-one and a half degrees east to a tree, and there it stops at a long distance from the place of beginning. It is clear, therefore, that these lines do not inclose any land, and hence it is not true, as charged by the judge, that the plaintiff's deed covered the land in dispute; and such a deed, with such a description, cannot be used as the basis of a constructive adverse possession under the statute. (2 R. S., 294; Code, § 83; *Jackson* v. *Woodruff,* 1 Cow., 276; *Jackson* v. *Camp,* 1 Cow., 605; *Lane* v. *Gould,* 10 Barb., 254.) Under a deed containing such an absurd description, the plaintiff cannot claim that his title is founded upon a written instrument.

The judgment should therefore be reversed and new trial granted, costs to abide event.

All concur; LOTT, Ch. C., not sitting.

Judgment reversed.