### STATE OF INDIANA *v.* MILK and others.[*]

*(Circuit Court, D. Indiana.   April 18, 1882.)*

1. SWAMP-LAND ACT CONSTRUED—CONSTRUCTION OF INTERSTATE GRANTS.
     The state of Indiana acquired title to the bed of Beaver lake, (which is overflowed land,) by virtue of the act known as the "Swamp-land grant of 1850." A more liberal rule of construction is allowable in interpreting a grant from one state or political community to another, than is permitted in interpreting a mere private grant; *e. g.*, a grant by a government to a private individual of land upon a navigable river is limited to the shore, while such a grant to a political community extends to the middle of the stream.

2. RIPARIAN RIGHTS ON NON-NAVIGABLE STREAMS, LAKES, AND PONDS.
     Non-navigable streams are usually narrow, and the lines of riparian owners can readily be extended into them at right angles without confusion or injustice.

*Reported by Chas. H. McCarer, Asst. U. S. Atty.

But practical difficulties arise in applying the rule to lakes and ponds having no current, and being more or less circular. Mere proprietorship of the surround ing lands will not in all cases give ownership to the beds of natural non-navigable lakes and ponds. As to them, the application or non-application of the rule depends largely upon the facts in the given case. The rule is that while a general grant of land on a river or stream *non*-navigable extends the line of the grantee to the middle or thread of the current, a grant on a natural pond or lake extends only to the water's edge.

3. ESTOPPEL—DOCTRINE OF, APPLIES TO STATES.

Resolute good faith should characterize the conduct of states in their dealings with individuals, and there is no reason in morals or law that will exempt them from the doctrine of estoppel.

*D. P. Baldwin,* Atty. Gen., and *Julian & Julian,* for the State.
*Baker, Hord & Hendricks,* for defendants.

GRESHAM, D. J. The state sues to recover possession of 2,868 acres of land, once part of the bed of Beaver lake, in Newton county. The defendants plead specially the facts upon which they claim title to the premises in dispute:

All the lands surrounding the lake were surveyed by the United States in 1835, but the lake was never surveyed nor the bed offered for sale. A meander line was run by the surveyors around the lake, which line and the lake are represented on the government surveys and plats. All the lots or government subdivisions surrounding the lake were ceded to the state by what is known as the swamp-land act of 1850; and patents were subsequently issued by the United States to the state for these lands, by their designations on the original maps and surveys. The general assembly of Indiana passed an act, approved March 9, 1852, to regulate the sale of the swamp lands donated by the United States to the state, and to provide for draining and reclaiming the same, as required by the conditions of the grant. The lake, at the time of the grant by the United States, and long prior thereto, was a shallow, non-navigable, fresh-water pond, containing 14,000 acres of land, with no outlet, 40 feet above the Kankakee river, and between four and five miles from it.

After the passage of the last-named act, and in pursuance of it, the state, by its proper officer, surveyed and located a ditch from the lake to the river for the purpose of draining the lake and the lands surrounding it; and after the location of this ditch, but before its construction, the state sold and patented to John P. Dunn part of the lots or tracts abutting on the lake, and to John P. Dunn and A. B. Condit, jointly, the remainder of all such lots. All these lots Dunn and Condit, and their wives, afterwards conveyed in fee, by proper deeds, to Michael G. Bright, who, on the fifth of April, 1857, made and acknowledged a map or plat of the surrounding lots or tracts of land, and of the bed of the lake, whereby he subdivided the bed and the surrounding tracts into 40-acre lots, numbering them consecutively from 1 to 427. These lots were formed by extending the right lines east and west and north and south from the outward lines of the government surveys, such extensions being made just as the government would have made them, but for the obstruction of the waters of the lake, and by dividing these lines

so extended by right lines drawn from points equidistant from corners formed by due intersection. Bright recited in this plat that he had acquired title in fee to all the abutting tracts from Dunn and Condit, and as riparian proprietor was entitled to and the owner in fee of the entire bed of the lake; that the lake had already been partially drained and in time the bed would be reclaimed and fit for cultivation, and that he reserved to himself and his grantees the right to maintain the ditches and drains, and, if necessary, to extend and otherwise enlarge them. After this plat had been duly recorded in the county in which the lake was situated, Bright and his wife, on the nineteenth of November, 1860, by their deed of that date, conveyed in fee to Aquilla Jones 197 of the 40-acre lots, by their designated odd numbers on the plat, these lots containing in the aggregate 8,880 acres; and one month later Jones and his wife, by their deed, conveyed in fee the same lots to the state, describing them by their designated odd numbers on the plat. These deeds were both properly recorded.

An act was passed by the general assembly of Indiana, on the twelfth of December, 1860, and approved the same day, "to provide for the sale of certain lands belonging to the state of Indiana, in the counties of Jasper and Newton, and to give protection to actual settlers thereon." Section 1 of this act reads as follows: "That the lands belonging to the state of Indiana, in the counties of Jasper and Newton, acquired by conveyance from Michael G. Bright, dated November 19, 1860, and of Aquilla Jones, December 31, 1860, shall be offered for sale at public auction, by the auditor and treasurer of the county in which said lands may be situated, at the door of the court-house in said counties, on a day to be fixed by said auditor and treasurer, not sooner than six nor later than eight months after the passage of this act."

After the sale to Dunn and Condit, and before their sale to Bright, the state constructed the ditch previously located, from the margin of the lake to the river, wide enough and barely deep enough to afford a current from the lake to the river, and the action of the water deepened the ditch until the lake was so far drained as to render 2,000 acres of the bed fit for pasture lands, at the time Bright made and acknowledged his plat.

After the passage of the last-named act, and before the eleventh of January, 1873, the state sold and conveyed to divers persons, for sums amounting in the aggregate to more than $10,000, the lands conveyed by Bright to Jones, and by the latter to the state, such conveyances all being of designated odd numbers on Bright's plat, and by reference to it; and during the same period Bright and his wife sold and conveyed to divers persons the remaining even-numbered lots, describing them in like manner, by reference to his plat; the state and Bright both selling the latter's riparian title to the lots in the bed of the lake. On the last-named date, January 11, 1873, by an act of congress approved on that day, the United States ceded to the state the bed of Beaver lake, and the state now claims title to the lands in suit under that act. While the state was constructing the main ditch from the bed to the river, Dunn and Condit were engaged in constructing lateral ditches into and through the bed of the lake. This work was continued by Dunn and Condit until they sold to Bright, and he and his grantees of even-numbered lots, and the state's grantees of odd-numbered lots, prosecuted the work of drainage, extending the

main ditch three miles out into the lake, and the lateral ditches until they aggregated in length more than 30 miles. This was all done at the expense of Dunn and Condit, and Bright and his grantees, and the state's grantees, and it involved an outlay five times greater than the outlay of the state in constructing the main ditch from the margin of the lake to the river. Since the year 1860, and up to the present time, Bright and his grantees of even-numbered lots have been required to pay state and county taxes upon the lots in the bed of the lake, held by them as aforesaid, amounting to thousands of dollars.

Before the commencement of this suit the defendant Lemuel Milk acquired title to the lots in dispute, by deed in fee, from Bright and wife, and conveyed the same title, through a trustee, to his wife and co-defendant, Jane A. Milk. The ditching done by Dunn and Condit, and Bright and his grantees, and the state's grantees, before the cession of the United States, in 1873, so far drained the lake that 4,000 acres of the bed became fit for cultivation, and the residue, except 600 acres, became fit for pasture lands.

At the same time that Lemuel Milk made his purchase of the even-numbered lots in dispute, he bought a like number of odd-numbered lots in the bed of the lake from the state, some of the latter lots adjoining some of the even-numbered lots so purchased from Bright.

The first question raised by the demurrer to the special answer is, did the state acquire title to the bed of Beaver lake by virtue of the swamp-land act of 1850?

It is asserted by the state that as this was a natural, non-navigable, and unsurveyed lake no title to its bed passed to the state by virtue of the cession of 1850, and that the title remained in the United States until it was conveyed to the state by the congressional act of January 13, 1873.

It is contended on the other hand, for the defendants, that the common law which limits the owner of land bordering on a natural, non-navigable lake or fresh water pond to the outer margin, is administered by the federal courts only as a part of the law of the states where it has been adopted, and that the interpretation of the swamp-land grant is a federal question, to be decided by federal statutes and rulings, if any there be.

Section 9 of an act of congress passed May 18, 1796, relating to the north-west territory, reads thus:

"That all navigable rivers within the territory, to be disposed of by virtue of this act, shall be deemed to be and remain public highways, and that in all cases where the opposite banks of any stream not navigable shall belong to different persons, the stream and the bed thereof shall become common to both."

The spirit and reason of this statute, it is urged, apply with equal force to ponds and non-navigable lakes of the size and character of

Beaver lake; and, if this is not true, that the statute furnishes an analogy for a rule which may be fairly deduced, applicable to this case.

In *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, this section was interpreted to mean that instead of the owners of opposite banks of a non-navigable stream being tenants in common of the bed, each held in severalty to the center of the stream.

The liberty that was exercised in this case of construing the statute according to its spirit and purpose, rather than by its words, would, it is contended, authorize an interpretation of the words "a stream not navigable," as intended to include lakes not navigable.

No right was reserved by the act of 1796 to the beds of non-navigable streams, because the public had no interest in such streams, and it was not the policy of the government to be a land-owner in the states. But whether or not section 9 of this act was intended to embrace ponds and non-navigable lakes as well as non-navigable streams, I think the state acquired title to the bed of Beaver lake by virtue of the swamp-land grant of 1850. Section 1 of that act provided that to enable the state of Arkansas to construct the necessary levies and drains to reclaim the swamp and overflowed lands therein, rendered unfit thereby for cultivation, the whole of such lands remaining unsold at the passage of the act should be granted to the state. Section 2 made it the duty of the secretary of the interior to make an accurate list and plats of such lands, and transmit the same to the governor of Arkansas, and, at the request of the governor, to cause a patent to be issued to the state therefor, and on that patent the fee-simple to such land should vest in the state, subject to the disposal of its legislature; provided, however, that the proceeds of such lands, whether from sale or direct appropriation in kind, should be applied exclusively, as far as necessary, to reclaiming such lands by levying and draining the same. Section 3 provided that, in making out a list and plats, all legal subdivisions, the greater part of which were wet and unfit for cultivation, should be included in such lists or plats; but when the greater part of a subdivision was not of that character the whole of it should be excluded therefrom. Section 4 extended the act and its benefits to each of the other states in the Union in which swamp and overflowed lands unfit for cultivation were situated.

This grant was accepted by the state of Indiana, and all the lands surrounding Beaver lake were embraced, by their numbers, in the

patent that was issued to the state for these and other lands.   There were at this time, in many of the states, swamp and overflowed public lands which were of no value to the government for any purpose, present or prospective, unless drained.   It had never been the policy of the government to reclaim such lands with a view to their sale. They were unfit for cultivation and useless for habitation.   The drainage of these sections would promote settlement, by rendering them more healthful, and no system of drainage could be successful that did not embrace the lakes and ponds.   Here, then, was a grant by the government of the United States to a number of the states, of lands of designated classes, to secure objects of public interest. In interpreting such a grant, no rigid rules of construction should be allowed to defeat the plain object and purpose of the parties.   By accepting the grant, the state assumed the duty and obligation of draining the lands acquired by it, including Beaver lake.   The state could not properly drain the lands surrounding this lake, without draining the lake into the Kankakee river; and yet it is urged for the plaintiff that the government retained its proprietary interest in the bed of the lake, and required the state to drain it at its own expense.

It is not probable that in passing the swamp-land act congress was influenced by such small considerations of thrift.

In ascertaining the real meaning of the parties a more liberal rule of construction is allowable in interpreting a grant from one state or political community to another, than is permitted in interpreting a mere private grant.   A grant by a government to a private individual of land upon a navigable river is limited to the shore, while such a grant to a political community extends to the middle of the stream. *Haight* v. *City of Keokuk,* 4 Iowa, 199; *Barney* v. *City of Keokuk,* 94 U. S. 324.

Section 2 of the swamp-land act provided that if the greater portion of any subdivision was wet or overflowed lands, the whole subdivision should be embraced in the grant, and it was left to official discretion what, if any, of the subdivisions surrounding a lake were within the grant.   But there was no doubt as to the character of the bed of Beaver lake: it was overflowed land, and as such the title to it was vested in the state.   This lake was indicated upon the government surveys and maps, and nothing remained to show that its bed was overflowed land within the meaning of the act.

The state, then, having acquired title to the bed of the lake under the swamp-land grant, we pass to the question: Did Dunn and Con-

dit, by virtue of their purchase of the surrounding tracts, acquire title to the bed as riparian proprietors?

Non-navigable streams are usually narrow, and the lines of riparian owners can be extended into them at right angles without interference or confusion, and without serious injustice to any one. It was therefore natural, when such streams were called for as boundaries, to hold that the real line between opposite shore owners was the thread of the current. The rights of the riparian proprietors in the bed of the stream, and in the stream itself, were thus clearly defined. But when this rule is attempted to be applied to lakes and ponds, practical difficulties are encountered. They have no current, and, being more or less circular, it would hardly be possible to run the boundary lines beyond the water's edge, so as to define the rights of shore owners in the beds. Beaver lake is seven and a half miles east and west, and less than five miles north and south. Extending the side and end lines into the lake, there being no current, when would they meet? This rule is applicable, if at all, whether there be one or more riparian proprietors. I do not think the mere proprietorship of the surrounding lands will, in all cases, give ownership to the beds of natural non-navigable lakes and ponds, regardless of their size. It would be unfair and unjust to allow a party to claim and hold against his grantor the bed of a lake containing thousands of acres, solely on the ground that he had bought and paid for the small surrounding fractional tracts—the mere rim.

A person might, by purchasing the lands surrounding a small lake, in view of its size and other circumstances, be held to own the bed. Each case depends largely on its own facts. *Forsyth* v. *Smale*, 7 Biss. 201.

That while a general grant of land on a river or stream, non-navigable, extends the line of the grantee to the middle or thread of the current, a grant to a natural pond or lake extends only to the water's edge, see *Wheeler* v. *Spinola*, 54 N. Y. 377; *Canal Com'rs* v. *People*, 5 Wend. 423; *Dillingham* v. *Smith*, 30 Me. 370; *Mansur* v. *Blake*, 62 Me. 38; *Paine* v. *Woods*, 108 Mass. 160; *State* v. *Gilmanton*, 9 N. H. 461; *Mariner* v. *Schulte*, 13 Wis. 775; *Delaplaine* v. *C. & N. W. Ry. Co.* 42 Wis. 214; *Boorman* v. *Sunnuchs*, 42 Wis. 233; *Seaman* v. *Smith*, 24 Ill. 521; *Austin* v. *Rutland R. Co.* 45 Vt. 215.

By their purchase of the abutting tracts Dunn and Condit acquired title to the water's edge and no further.

Is the state precluded by anything which has occurred since the purchase from asserting title to the lands in dispute?

Dunn and Condit were constructing lateral ditches at their own expense, extending out into the bed of the lake, at the same time that the state was constructing the main ditch from the lake to the Kankakee river, and they continued this work until their sale to Bright. It thus appears that at the very start the state's grantees of the government subdivisions surrounding the lake asserted title as riparian proprietors to the entire bed. Bright steadily asserted the same right as the grantee of Dunn, and of Dunn and Condit, and continued the work of ditching and draining the lake at his own expense. He asserted the same right in his recorded plat. His conveyance of alternate lots in the bed of the lake to the state through Jones, by their designated odd numbers on his plat, was a no less unequivocal assertion of the same right. With knowledge of the claim that had thus been asserted by Bright and his grantors, and that they and Bright had been carrying forward in the bed of the lake a system of drainage at their own expense, the state purchased Bright's title to the odd-numbered lots by their designations on his plat, and from that time forward the state has levied and collected taxes on the even-numbered lots and on the odd-numbered lots after their sale by the state to others. The state had its election of insisting on its claim to the entire bed of the lake, or of accepting Bright's title to part of it. It saw fit to do the latter, with full knowledge of all the facts, and it is bound by its election, especially in favor of innocent third parties whose rights have intervened, whatever may have been its rights in the first instance. The state's purchase of Bright's title to part of the lots in the bed of the lake was an admission of the validity of that title, and a settlement of any disagreement that had arisen between the state and Bright growing out of the latter's assertion to that title. It was competent for the state and Bright to settle any question of disputed boundary between them, in their own way, and having done that the state is concluded in favor of parties who subsequently purchased from Bright on the faith of that settlement.

That the state understood its acceptance of Bright's title to the odd-numbered lots operated as an establishment of the latter's boundaries in the bed of the lake, is shown by the subsequent levy and collection of taxes on the remaining portion of the bed, as well as by the passage of the act of 1865. The passage of this act was a solemn admission, that the state's grants of the abutting tracts entitled her grantees to the bed of the lake as riparian proprietors, and had the effect of confirming Bright's title to so much of the bed as he had not conveyed to the state.

Purchasers at public sale of lots acquired from Bright had a right to suppose, and they no doubt did suppose, that the state had acquiesced in and confirmed Bright's title to the bed of the lake. If the state could convey title to the odd-numbered lots as Bright's grantee, the latter could certainly convey title to the even-numbered lots. The defendants bought 54 odd-numbered lots from the state, and at the same time bought a like number of even-numbered lots from Bright. Both sold the same title, and it is fair to assume that the defendants would have bought from neither, if the state had then asserted the same right that is asserted in this suit. The state occupies an attitude in this litigation not at all consistent with its purchase of the Bright title, the passage of the act of 1865, the subsequent sale of all the lots aquired from Bright, and the levy and collection of taxes, since 1860, on all the even-numbered lots, as well as the odd-numbered lots, from the time the latter were purchased from the state.

Having induced the defendants, by repeatedly recognizing the validity of the Bright title, and by finally confirming it by the act of 1865, to alter their position by investing their money in that title, the state cannot now, in fairness, allow or assert its invalidity.

Resolute good faith should characterize the conduct of states in their dealings with individuals, and there is no reason, in morals or law, that will exempt them from the doctrine of estoppel. *Com.* v. *Andre*, 3 Pick. 224; *Com.* v. *Pejepscut Proprietors*, 10 Mass. 155; *People* v. *Soc. for Prop. of Gosp.* 2 Paine, 545; *State* v. *Bailey*, 19 Ind. 452; *People* v. *Maynard*, 15 Mich. 463; *Cahn* v. *Barnes*, 5 FED. REP. 326.

Demurrer to special answer overruled.